**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 22 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 97-2222

MICHAEL BAUTISTA,

Defendant-Appellant.

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-96-408)

Roger A. Finzel, Assistant Federal Public Defender, Albuquerque, New Mexico, for appellant.

Kathleen Bliss, Assistant United States Attorney (John J. Kelly, United States Attorney, with her on the brief), Albuquerque, New Mexico, for appellee.

Before **BALDOCK**, **BARRETT**, and **LOGAN**, Circuit Judges.

**BARRETT**, Senior Circuit Judge.

Michael Bautista (Bautista) appeals from his conviction and sentence following a jury trial wherein he was found guilty of second-degree murder in Indian Country under 18 U.S.C. §§ 1153 and 1111.

Facts

On April 4, 1996, the body of David Carrillo (Carrillo), a 38-year-old member of the Laguna Indian Pueblo residing on an Indian Reservation in the State of New Mexico, was discovered in his apartment at the Laguna Rainbow Elderly Care Center. Carrillo suffered numerous blunt force wounds to his head and approximately 48 puncture wounds to his back, abdomen, and neck. The Laguna police informed FBI Special Agent Jeff Leggitt (Agent Leggitt) that Bautista and his friend, Quentin Martinez (Martinez), sometimes visited Carrillo at Carrillo's apartment.

On April 5, 1996, Agent Leggitt and FBI Special Agent Blaine Kohl spoke with Bautista privately at his home. During the brief interview, Bautista acknowledged that he and Carrillo were friends, but denied knowledge of Carrillo's death.

On June 26, 1996, Agent Leggitt and FBI Special Agent John Schum (Agent Schum) returned to Bautista's home. They told Bautista they needed to speak to him and asked him to accompany them to the Laguna Police Department. Bautista agreed to go with the agents. He rode with Agent Leggitt in Leggitt's vehicle. Agent Schum followed in his own vehicle.

At the station, Bautista, Agent Leggitt, and Agent Schum proceeded to a small conference room where FBI Special Agent Jim Langenberg (Agent Langenberg) joined them. During the initial questioning, Agents Leggitt and Langenberg sat across from Bautista and Agent Schum sat behind him. Agent Leggitt informed Bautista that their investigation revealed that he and Martinez knew more about Carrillo's death than he had previously told them and asked him to tell them "what really happened." (R.O.A., Supp. Vol. I at 15.) After a while it became evident that Bautista was sticking to the facts of his earlier statement, which Agent Leggitt believed did not comport with other evidence discovered in their investigation. *Id*. at 15-16. At that point, Leggitt told Bautista that,

"This is really serious. We need the truth, and before we do that, we need to advise you of your rights." *Id.* at 15. Agent Leggitt then advised Bautista of his Miranda[1] rights, reading him the FBI's standard advice and waiver of rights form, Form FD-395. Bautista refused to sign the waiver of rights form and stated that he did not want to answer any more questions. *Id.* at 18, 35. On the form, Agent Leggitt wrote, "Do not wish to make additional statements" and Bautista initialed it. *Id.* at 34. Bautista agreed, however, to be fingerprinted. Agents Leggitt and Langenberg then left the room to prepare to take Bautista's fingerprints, but Agent Schum continued to question Bautista, even though Bautista had previously indicated he did not wish to answer any more questions.

Agent Schum testified, at the suppression hearing, that he knew Bautista was close to telling them what really happened so he "continued to probe" trying to get Bautista to talk a little bit more. *Id.* Supp. Vol. II at 10. Agent Schum stated that Bautista admitted that he was present when Carrillo died, he and his friend Martinez were the only people in the house when Carrillo died, and Carrillo had done something to cause him "to react." *Id.* at 10-11. Bautista then told Agent Schum he did not want to say anything else or answer any more questions until he had spoken to a family friend or neighbor who was a lawyer. *Id.* at 11. Agent Leggitt testified that, "As soon as he [Bautista] started wanting to talk to a lawyer, I ceased all questioning." *Id.* Bautista was then fingerprinted and driven home.

On July 2, 1996, Agent Leggitt arrested Bautista at Cinnamon Hills alcohol treatment facility in St. George, Utah. Bautista was taken to a large conference room in the local federal building in

---

[1]    In Miranda v. Arizona, 384 U.S. 436, 479 (1966), the Supreme Court held that prior to any custodial interrogation, a suspect must be warned of certain constitutional rights, including the right to remain silent and the right to have an attorney present during questioning. *See* Discussion I.A. *infra*.

St. George by Agent Leggitt and another FBI agent. Agent Leggitt read Bautista his <u>Miranda</u> rights and Bautista waived his rights, agreeing to answer questions.

Bautista told Agent Leggitt that he and Martinez had bought a 40-ounce bottle of beer and some marijuana and that they had gone to Carrillo's apartment to share the marijuana and thereby repay Carrillo for some marijuana he had previously shared. He stated that things were fine until Martinez left the room to use the restroom and Carrillo asked him to spend the night. Bautista related that: he understood Carrillo wanted him to spend the night to have sex with him; Carrillo said, "Come on, we'll have a lot of fun," and made as many as four attempts to grab his crotch; he told Carrillo to stay away from him; and pushed Carrillo back into a chair. Bautista admitted hitting Carrillo in the side of the head with the 40-ounce beer bottle when Carrillo tried to grab him around the neck as if to choke him, causing Carrillo to stumble and fall into the living room. Bautista stated that Carrillo then reached for an ice pick, but that he got it first and began stabbing Carrillo with it. Bautista said he was enraged and "kept stabbing him and crying." When Martinez returned from the restroom, he and Bautista gathered a towel, the ice pick, and the broken beer bottle in a plastic bag, cleaned up Carrillo's apartment and left believing Carrillo was still alive. Agent Leggitt then wrote out Bautista's statement, which Bautista signed and initialed.

On July 17, 1996, Bautista was indicted on the charge of second-degree murder. On August 26, 1996, Bautista filed a motion to suppress his June 26, 1996, statements to Agent Schum and his July 2, 1996, confession to Agent Leggitt. After an evidentiary hearing, the district court denied his motion.

At trial, Bautista proffered evidence of Carrillo's homosexuality, through the testimony of two defense witnesses, in support of his defense theory that Carrillo attacked him such that he had

- 4 -

not murdered Carrillo, but that he had killed in the heat of passion upon adequate provocation. The district court ruled the proffered evidence/testimony was irrelevant and, thus, inadmissible. The court concluded that Carrillo's homosexuality was not an essential element of the offense and that it was not evidence that Carrillo was prone to aggressive homosexual advances.

On January 30, 1997, a jury found Bautista guilty of second-degree murder. He was sentenced to 210 months imprisonment and five years of supervised release.

On appeal, Bautista contends that the district court erred (1) in failing to suppress the incriminatory statements he made to Agent Schum on June 26, 1996, after he invoked his right to remain silent and his July 2, 1996, confession, and (2) in refusing to allow two defense witnesses to testify as to Carrillo's homosexuality.

Discussion

I. Incriminating Statements

Bautista contends that the district court erred in failing to suppress his June 26, 1996, statements and his July 2, 1996, confession.

First, Bautista asserts that his June 26, 1996, statements were obtained during custodial interrogation in violation of his rights under Miranda, because Agent Schum continued to interrogate him after he had expressly invoked his right to remain silent. He argues that he was in custody for purposes of Miranda on June 26, 1996, because the agents: used strong-arm tactics by appearing unannounced at his home; secured his agreement to accompany them to the police station by telling him they needed to talk to him and had serious questions; promised him he was going to return home; created a police-dominated atmosphere in the conference room; and used the Miranda warning as a psychological vehicle to intimidate and impress him with their authority. He claims

that under the circumstances Schum's flagrant disregard of his invocation of his right to remain silent would lead any reasonable person to conclude that he was at the mercy of the agents and not free to leave. Bautista also maintains that his statements were involuntary and inadmissible.

Second, Bautista asserts that his July 2, 1996, confession stemmed from the June 26, 1996, violation of his right to remain silent and, as such, was inadmissible in the government's case-in-chief as "fruit of the poisonous tree." He claims that when Agent Schum ignored his attempt to invoke his right to remain silent, his confession was fatally tainted and that no meaningful intervening circumstances removed the taint. In addition, Bautista alleges that his July 2, 1996, confession was inadmissible because it was taken in violation of his Miranda right to counsel as guaranteed in Edwards v. Arizona, 451 U.S. 477 (1981). He argues that once he invoked his right to counsel by stating he did not want to answer any more question until he had spoken with his neighbor, an attorney, he was not subject to further interrogation until counsel was made available to him and that in the absence of counsel, he could not effectively waive his rights.

The government responds that the district court properly found Bautista was not in custody during the June 26, 1996, interview and, thus, he was not entitled to the safeguards of Miranda. The government contends that the agents were not required to give Bautista a Miranda warning because he was not in custody; accordingly, any incriminating statements Bautista made were freely and voluntarily given and it did not matter that Agent Leggitt unnecessarily advised him of his Miranda rights. The government further claims that the district court correctly found that Bautista's desire to speak to an attorney prior to further questioning, expressed in a non-custodial interview, did not trigger the Edwards rule, because Edwards only prohibits further interrogation of suspects in custody without the presence of an attorney once the suspect has requested an attorney. The government

asserts that a suspect cannot invoke Edwards in non-custodial situations and that Miranda rights are not anticipatory, i.e., a suspect cannot invoke his Miranda rights prior to custodial interrogation. Finally, the government maintains that if Bautista's statements were taken in violation of Miranda and Edwards, the district court's admission of his July 2, 1996, confession was harmless error.

When reviewing a denial of a motion to suppress, we accept the district court's underlying factual findings unless clearly erroneous. United States v. Giles, 967 F.2d 382, 385 (10th Cir. 1992). The determination of whether a defendant was in custody for purposes of Miranda is based on the totality of the circumstances; thus, it is necessarily fact intensive. United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997). Therefore, we review the district court's determination that Bautista was not in custody on June 26, 1996, for clear error. *Id.* "A finding of fact is not clearly erroneous unless it is without factual support in the record, or if the appellate court after reviewing all the evidence, is left with the definite and firm conviction that a mistake has been made." Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d 1182, 1185 (10th Cir. 1990) (internal quotation omitted).

A.

In Miranda v. Arizona, 384 U.S. 436 (1966), "the Supreme Court examined an individual's Fifth and Fourteenth Amendment right to be free from compelled self-incrimination in the context of custodial interrogation, and concluded that certain procedural safeguards were necessary to 'dissipate the compulsion inherent in custodial interrogation and, in so doing, guard against abridgement of [a] suspect's Fifth Amendment rights.'" Alston v. Redman, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting Moran v. Burbine, 475 U.S. 412, 425 (1986)), *cert. denied*, 513 U.S. 1160 (1995). These safeguards include certain rights that an accused must be informed of and must waive

before custodial interrogation can commence. *Id.*

> [A suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Miranda, 384 U.S. at 479. Only if there is a voluntary, knowing, and intelligent waiver of these rights can authorities question a suspect without counsel being present and introduce at trial in the case-in-chief any statements made during the interrogation. *Id.*; Glover, 104 F.3d at 1581-82.

In Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court added a second layer of prophylaxis to the Miranda right to counsel. In Edwards, the Court considered a suspect's Fifth Amendment right against self-incrimination when a suspect makes incriminating statements after invoking his right to have an attorney present during interrogation. Edwards, 451 U.S. at 479. The Court held that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." *Id.* at 484-85. *See* Giles, 967 F.2d at 386 (defendant did not initiate conversation, thus, evidence was obtained as direct result of unlawful interrogation by officers); United States v. Obregon, 748 F.2d 1371, 1380-81 (10th Cir. 1984) (no Edwards violation where defendant initiated further communication); United States v. De La Luz Gallegos, 738 F.2d 378, 381 (10th Cir.) (Edwards does not "prohibit the use of spontaneous declarations not brought about by the prompting of law enforcement officials."), *cert. denied*, 469 U.S. 1076 (1984). "If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as

- 8 -

substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards."[2] McNeil v. Wisconsin, 501 U.S. 171, 177 (1991). "This is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights.'" *Id.* (citing Michigan v. Harvey, 494 U.S. 344, 350 (1990)). *See* Minnick v. Mississippi, 498 U.S. 146, 150 (1990) (citing Harvey, 494 U.S. at 350). Moreover, unlike an accused's Sixth Amendment right to counsel, the Edwards rule is not offense specific. *Id*; Arizona v. Roberson, 486 U.S. 675, 685 (1988). "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding *any* offense unless counsel is present." McNeil, 501 U.S. at 177.

The notion that custodial interrogations, in and of themselves, have inherently coercive effects on the accused is the essential predicate to the prescriptions contained in the Miranda-Edwards line of cases requiring counsel to be present, if requested, when interrogation occurs in a custodial setting. *See* Roberson, 486 U.S. at 685 (Fifth Amendment right against compelled self-incrimination "is protected by the prophylaxis of having an attorney present to counteract the inherent pressures of custodial interrogation,"); Alston, 34 F.3d at 1243-44. Thus, in order to implicate the Miranda-Edwards right to counsel prophylaxis, both a custodial situation and official interrogation are required.[3] Absent either a custodial situation or official interrogation, Miranda and

---

[2]     Although a suspect can subsequently waive his right to counsel, "a valid waiver of that right cannot be established by showing only that [the suspect] responded to further police-initiated custodial interrogation even if he has been advised of his rights." Edwards, 451 U.S. at 484.

[3]     In United States v. Kelsey, 951 F.2d 1196, 1198-99 (10th Cir. 1991), we held that a suspect's request for counsel is within the ambit of Edwards when the suspect requests counsel after he is arrested but before he has been asked any questions or read his Miranda rights. In so doing, we noted that "*Edwards* is triggered by 'some statement that can reasonably be construed

Edwards are not implicated. *See* Roberson, 486 U.S. at 682 (Edwards applies "after a person in custody has expressed his desire to deal with the police only through counsel, . . .."); Michigan v. Jackson, 475 U.S. 625, 626 (1986) ("In Edwards, . . ., we held that an accused person in custody . . .."); United States v. Roman-Zarate, 115 F.3d 778, 782 (10th Cir. 1997) (no Edwards violation when no "interrogation" occurred); United States v. LaGrone, 43 F.3d 332, 339 (7th Cir. 1994) ("in order for a defendant to invoke his *Miranda* rights the authorities must be conducting interrogation, or interrogation must be imminent"); Alston, 34 F.3d at 1244 (both needed to trigger Miranda right to counsel); Tukes v. Dugger, 911 F.2d 508, 515-516 (11th Cir. 1990) ("[B]ecause [defendant] was not in custody, he may not obtain relief under *Edwards*."), *cert. denied*, 502 U.S. 898 (1991).

The remedy for a violation of Miranda or Edwards is straightforward: any statement given in violation of the rules established in these cases cannot be introduced as substantive evidence in the state's case-in-chief. *See* Miranda, 384 U.S. at 479. *C.f.* Harris v. New York, 401 U.S. 222, 225-26 (1971) (allowing use of statements obtained in violation of Miranda for purposes of impeachment).

B.

The district court denied Bautista's motion to suppress his June 26, 1996, statements and his July 2, 1996, confession. The court found that Bautista voluntarily accompanied Agents Leggitt and

---

to be expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*.'" *Id*. (quoting McNeil, 501 U.S. at 178). Thus, "custodial interrogation" includes those instances where a defendant is in custody and it is clear that questioning/interrogation is imminent. *See id*. at 1199 ("It [wa]s clear from the exchange between Kelsey and the police . . . that the police intended to question Kelsey at some point at his home, and that the police understood Kelsey to be invoking his right to counsel during questioning."). *See also* United States v. LaGrone, 43 F.3d 332, 339 (7th Cir. 1994) (in order to invoke Miranda rights "interrogation must be imminent")

Schum to the police department on June 26, 1996, that he voluntarily agreed to provide his fingerprints, and that "at no time" on June 26, 1996, was Bautista in custody.[4] (R.O.A., Vol. I, Doc. 36 at 2-4.) Based on the finding that Bautista was not in custody on June 26, 1996, the district court ruled that his invocation of his <u>Miranda</u> right to counsel was ineffective and that <u>Edwards</u> did not apply. *Id.* at 5. In addition, the court found that he voluntarily and knowingly waived his right to remain silent and his right to have counsel present prior to making his confession on July 2, 1996. *Id.* at 5-6.

With respect to Bautista's June 26, 1996, statements made to Agent Schum after he expressed his desire not to answer any more questions, it is undisputed that the government did not introduce these statements in evidence, either in its case-in-chief or in rebuttal. (Aplt. Brief-in-Chief at 22 and 30 n.7; Brief of Aplee. at 2, 12, and 32.) Thus, we consider Bautista's argument that these statements were involuntary and inadmissible only for any affect they may have had on the admissibility of his July 2, 1996, confession.

We turn now to Bautista's contentions that his July 2, 1996, confession is inadmissible. It is clear from the record that on June 26, 1996, Bautista voluntarily accompanied Agents Leggitt and Schum to the police department to answer questions. It is equally clear that until Agent Leggitt read

---

[4] Apparently, the district court relied on Bautista's testimony that the June 26, 1996, interview lasted approximately a half an hour. (R.O.A., Vol. I, Doc. 36 at 3-4.) However, a review of all the testimony presented at the suppression hearing reveals that the interview must have lasted much longer. Agent Leggitt testified: they interviewed Bautista, "After lunch, probably 1:00 or 2:00 o'clock," *id.* at 15; they interviewed Bautista, "After lunch, about 2:00 or 3:00 p.m.," *id.* at 57; the police station was approximately 10 minutes from Bautista's home, *id.* at 13; Bautista signed the <u>Miranda</u> advice of rights form at 4:28 p.m., *id.* at 33 and 57; and Bautista was returned home around 5:00 p.m., *id.* at 57. Bautista's mother testified that he returned home "between 5:00 and 6:00 p.m." *Id.* at 68. Based on this testimony, we believe that Bautista's interview lasted anywhere from two to four hours.

Bautista his <u>Miranda</u> rights, Bautista was not under arrest nor in custody. Thus, the district court did not commit clear error in determining Bautista was not in custody for purposes of <u>Miranda</u> up to that point. However, once the agents deemed Bautista's answers to their questions sufficiently troublesome that they believed a <u>Miranda</u> warning was necessary, the situation changed. Although giving a <u>Miranda</u> warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation, it is a factor to be considered by the court. *See* <u>United States v. Charles</u>, 738 F.2d 686, 693 n.6 (5th Cir. 1984) ("[G]iving a suspect *Miranda* warnings in noncustodial setting does not . . . transform that setting into . . . a custodial interrogation for *Miranda* purposes."); <u>United States v. Lewis</u>, 556 F.2d 446, 449 (6th Cir.) (giving of <u>Miranda</u> rights does not restrain a suspect or convert a non-custodial interview into custodial interrogation), *cert. denied*, 434 U.S. 863 (1977).

The district court properly noted that the reading of the <u>Miranda</u> warning to a suspect does not create a custodial interrogation. (R.O.A., Vol. I, Doc. 36 at 4.) However, in this case <u>Miranda</u> rights were given only *after* the agents believed the interview was coming to an end and in response to their belief that Bautista might say something incriminating. *Id.* Supp. Vol. I at 15 (<u>Miranda</u> rights read when "his information didn't appear to add up"); *id*. at 16 ("we advised him of his rights when . . . they were going to close the interview off, he was going to stick with his statement that didn't seem to fit with our other evidence"); *id*. at 55-56 ( <u>Miranda</u> rights given because agents "believed that he was hiding something and that as we began to ask more pointed questions, that he may, in fact, provide us with a statement that implicates himself"). From the record, it appears that the district court failed to consider whether, under the totality of the circumstances in this case, the interview became custodial.

It is not dispositive that the agents believed Bautista was not in custody or that Bautista believed that he was. *See* Charles, 738 F.2d at 693 n.7 (subjective belief of officers and defendant factors to consider but not dispositive). However, we note that in responding to the court as to why questioning continued after Bautista had expressed his desire not to answer any more questions, Agent Schum testified that, "Sir, I did not believe he was in custody, and there are many times during the course of an investigation when people are in custody when they initially are reluctant to talk to us and we must be persistent to get them to talk to us." (R.O.A., Supp. Vol. II at 18.) If Agent Schum ignored Bautista's right to remain silent on the basis that he was not in custody, then one must ask, why did he immediately cease asking questions and respect Bautista's Miranda right to counsel? Both rights require *custodial* interrogation. Based on our review of the record and the foregoing, we are concerned that the district court may have erred in its determination of custodial versus non-custodial interrogation in this case.[5] However, we decline to discuss this issue further since our result would be the same under either conclusion.

If Bautista was not in custody on June 26, 1996, during the questioning, then his attempts to invoke his right to remain silent and his Miranda right to counsel were ineffective. Thus, we are concerned only with whether Bautista voluntarily and knowingly waived these rights on July 2, 1996, prior to his confession. A waiver is voluntary if the totality of the circumstances demonstrates (1) the waiver was a product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving. United States v. Toro-Pelaez, 107 F.3d 819, 825 (10th Cir.), *cert.*

---

[5]      Additionally, we note Agent Schum's confusion between non-custodial and custodial situations in his testimony when he discusses using persistent questioning to get someone to talk during custodial situations. *See* R.O.A., Supp. Vol. II at 18.

*denied*, ___ U.S. ___ (1997).  The determination of whether a valid waiver of Fifth Amendment rights has occurred is a question of law, which we review *de novo*.  *Id*. at 826.

The record reveals that Bautista was arrested at approximately 10:30 a.m., taken to the federal building in St. George, Utah at 10:43 a.m. where he was advised of his Miranda rights at approximately 10:50 a.m., and by 12:10 a.m. the agents had finished taking his statement/confession. (R.O.A., Supp. Vol. I at 101.)  There is no indication that the agents intimidated, coerced, or deceived Bautista at any stage in this process.  *See id*. at 32-33.  Bautista testified that the agents did not threaten him, beat him, or make any promises to him.  *Id*. at 92.  Based on the totality of the circumstances, we hold that Bautista voluntarily and knowingly waived his Miranda rights on July 2, 1996.

If, as Bautista argues, the non-custodial interview on June 26, 1996, became a custodial interrogation after Agent Leggitt read Bautista his Miranda rights, then Bautista effectively invoked his right to remain silent and his Miranda right to counsel.  Miranda and Edwards would then have applied.  Bautista clearly and unequivocally requested to speak with an attorney prior to answering any more questions.   It is undisputed that Bautista told Agent Schum that he wanted to talk to a friend that was an attorney before he answered any more questions.[6] (R.O.A., Supp. Vol. I at 22, 35, 76-77, and 89; Supp. Vol. II at 11.)  Agent Schum recognized his statement as unequivocally

---

[6]     In contrast, Bautista testified at the suppression hearing that he informed all three agents that he wanted to speak to a lawyer immediately after Agent Leggitt advised him of his rights and he said he did not want to answer anymore questions.  (R.O.A., Supp. Vol. I at 76-77 and 89.)  However, "once a suspect has invoked the right to counsel, knowledge of that request is imputed to all law enforcement officers who subsequently deal with the suspect." United States v. Scalf, 708 F.2d 1540, 1544 (10th Cir. 1983).  Therefore, it is immaterial whether Bautista told all three agents he wanted to talk to his friend the attorney or whether he informed only Agent Schum after Agents Leggitt and Langenberg had left the room.

- 14 -

invoking his Miranda right to counsel by testifying at the suppression hearing, "As soon as he started wanting to talk to a lawyer, I ceased all questioning." (R.O.A., Supp. Vol. II at 11.) Therefore, we focus on whether Agent Leggitt's questioning of Bautista after his arrest on July 2, 1996, violated Edwards, which prohibits further custodial interrogation of a suspect after the suspect has, while in custody, invoked his right to counsel.

We hold that Agent Leggitt's interrogation of Bautista on July 2, 1996, was not in violation of the Supreme Court's mandate in Edwards. Edwards is premised on the inherently coercive nature of custodial interrogation and is designed to prevent the authorities from badgering a suspect in custody after the suspect has invoked his Miranda right to have an attorney present during questioning. *See* Roberson, 486 U.S. at 685. Therefore, as the Court in McNeil noted, in order for Edwards to apply, the suspect must be in custody from the time he invokes his right to the time when the subsequent interrogation is initiated. *See* McNeil, 501 U.S. at 177 ("assuming there is no break in custody"). If custody is broken, especially for a lengthy period of time, the inherently coercive nature of custody itself is diminished and there is little to no risk of badgering by the authorities. This is not to say that the police can circumvent Edwards by temporarily releasing a suspect for a short period of time and then reacquiring him. Whether a break in custody is sufficient to remove a suspect's request for counsel from the ambit of Edwards must be evaluated under the totality of the circumstances.

Here, Bautista was driven home after the June 26, 1996, interview and allowed to leave New Mexico to attend an alcohol treatment program in Utah. He was then arrested six days later on July 2, 1996, in Utah. At that time, he voluntarily and knowingly waived his Miranda rights and confessed. *See* Discussion *supra*. We conclude that the six day break in custody was sufficient to

remove the effects of Bautista's June 26, 1996, invocation of his Miranda right to counsel. Therefore, we hold Agent Leggitt's questioning of Bautista on July 2, 1996, did not violate Edwards.

We also hold that Bautista's July 2, 1996, confession was not "fruit of the poisonous tree." Under the assumption Bautista was in custody on June 26, 1996, it is clear that Agent Schum violated Bautista's right to remain silent when he continued interrogating him after he was given and had invoked his Miranda right. However, this violation did not "taint" Bautista's otherwise voluntary waiver of his rights on July 2, 1996. The six day window between Agent Schum's disregard for Miranda and Bautista's confession is a sufficient intervening circumstance to wash away any taint. *See e.g.* United States v. Gregory, 79 F.3d 973, 980 (10th Cir. 1996) ("The facts or events must create discontinuity between the illegal stop and the consent such that the original illegality is weakened and attenuated."). We also note that even if Bautista believed Agent Schum would disregard his rights at a later time, there is no indication that he believed the same of Agent Leggitt, who actually questioned him in Utah. The record is clear Agent Leggitt properly respected Bautista's right to remain silent on June 26, 1996.

Finally, we address the government's assertion that it makes no difference that Agent Leggitt unnecessarily advised Bautista of his Miranda rights when Bautista was not in custody. The government's position misses the point of Miranda and Edwards. If the authorities are free to tell a suspect that he has the right to appointed counsel, but could, while continuing to interrogate him, refuse to provide such counsel on the grounds that the suspect was not actually in custody, the suspect would be led to believe that no request for counsel would be honored. "The coercive effect of continued interrogation would thus be greatly increased because the suspect would believe that the police 'promises' to provide the suspect's constitutional rights were untrustworthy, and that the

- 16 -

police would continue to violate those rights as they wished, regardless of assurances to the contrary." Tukes, 911 F.2d at 516 n.11. We do not suggest that a person can invoke his Miranda rights anticipatorily in any situation, i.e., in a context other than custodial interrogation, as the Court cautioned in McNeil. *See* McNeil, 501 U.S. at 182 n.3 ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'"); LaGrone, 43 F.3d at 340 (defendant may not invoke Miranda rights anticipatorily). However, law enforcement officers are not free to give the Miranda warning and then blatantly ignore a suspect's attempt to invoke any right thereunder.[7]

Therefore, we hold that, regardless of whether Bautista was in custody on June 26, 1996, the district court did not err in refusing to suppress his July 2, 1996, confession.

## II. Defense Witnesses

Bautista contends that the district court denied him his constitutional right to due process, compulsory process, and to present a defense when it excluded the testimony of two defense witnesses, Martinez and Leslie Whitt (Whitt). He argues that these witnesses would have provided favorable, material evidence concerning his defense that he killed Carrillo in the heat of passion upon adequate provocation by showing Carrillo was homosexual and had previously sexually assaulted his male friend. Bautista sought to introduce Martinez's testimony that it was his opinion and belief that Carrillo was homosexual and that Carrillo had made a pass at him. (R.O.A., Vol. V at 327-28, 338-39.) Bautista offered Whitt's testimony to corroborate Martinez's testimony regarding Carrillo's pass at him, as a prior consistent statement. *Id.* at 339.

---

[7] Nor are law enforcement officers free to ignore a suspect's request for counsel, absent a Miranda warning, where interrogation is imminent and the suspect is in custody. *See* Kelsey, 951 F.2d at 1199.

The government contends that the district court properly excluded evidence that Carrillo was a homosexual because the evidence was irrelevant and had no probative value. The government agrees with the district court's conclusion that a homosexual advance could not legally justify so great a rage as to create heat of passion sufficient to overcome the intent requirement of second-degree murder.

In determining that Bautista's proffered evidence was inadmissible, the district court concluded that homosexuality is not an essential element of the charge, second-degree murder, nor of the defense, heat of passion/provocation. *Id.* at 337. The court reasoned that homosexuality is not evidence that a person will make aggressive homosexual advances. *Id.* at 338. In addition, the court concluded that the evidence was not relevant within Fed. R. Evid. 405(b). *Id.* In the alternative, the court noted that in its opinion Fed. R. Evid. 403 would require exclusion of the evidence, as the probative value would be substantially outweighed by prejudice. *Id.* at 340.

The district court has broad discretion in determining the admissibility of evidence. United States v. Talamante, 981 F.2d 1153, 1155 (10th Cir. 1992), *cert. denied*, 507 U.S. 1041 (1993). We review the district court's evidentiary rulings for abuse of discretion. *Id.* We will not disturb the court's ruling unless we have a definite and firm conviction that the court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances. *Id.* (internal quotation omitted).

The right to present a defense is a "fundamental element of due process of law." Richmond v. Embry, 122 F.3d 866, 871 (10th Cir.1997) (internal quotations omitted), *cert. denied*, ___ U.S. ___ (1998). *See* Taylor v. Illinois, 484 U.S. 400, 409 (1988) (quoting Washington v. Texas, 388 U.S. 14, 19 (1967)). However, the right to present defense witnesses is not absolute. A defendant

must abide the rules of evidence and procedure. Richmond, 122 F.3d at 871-72. *See e.g.* United States v. Martinez-Morel, 118 F.3d 710, 715 (10th Cir. 1997) (no error when evidence/testimony irrelevant). This includes standards of relevance and materiality. Thus, the district court did not violate his Sixth Amendment right to present a defense by preventing such evidence from being admitted at trial.

We agree with the district court that testimony of Carrillo's homosexuality was irrelevant and potentially highly prejudicial. We fail to discern how the victim's sexual orientation is relevant to the charge of second-degree murder or to a defense of "heat of passion." *See* R.O.A., Vol. V at 337-38.

In contrast, however, evidence of the victim's aggressive character may be admissible, whether homosexually or heterosexually motivated, to establish that the victim was the aggressor. Perrin v. Anderson, 784 F.2d 1040, 1045 (10th Cir. 1986). Federal Rule of Evidence 404(a)(2) permits the use of "[e]vidence of a pertinent trait of character of the victim of the crime offered by the accused . . .." However, Fed. R. Evid. 405 limits the type of character evidence to reputation or opinion evidence unless the character or trait of character is an essential element of the charge, claim, or defense. In Perrin, we established that the use of evidence of a victim's violent character to prove that the victim was the aggressor is circumstantial use of character evidence. Perrin, 784 F.2d at 1045. Therefore, Bautista could have introduced evidence of Carrillo's reputation for aggressiveness, but he could not introduce specific instances of aggressive conduct.

Here, Bautista sought to introduce Martinez's testimony that Carrillo made a pass at him and Whitt's testimony that Martinez told her about the incident. This testimony, however, shows specific conduct of the victim rather than reputation or opinion concerning the character of the victim. As

such, this evidence was inadmissible pursuant to Fed. R. Evid. 405(a). *See* Talamante, 981 F.2d at 1156 ("Since Mr. Talamante offered testimony describing specific instances of the victim's conduct, as opposed to reputation or opinion evidence, this testimony was not admissible . . .."); Perrin, 784 F.2d at 1045 (court erroneously admitted testimony about specific violent incidents involving victim to prove victim was the aggressor). The district court properly noted that Bautista had the opportunity to testify that he feared Carrillo's aggressive homosexual advances and that he had killed Carrillo in the heat of passion upon adequate provocation. In fact, in his confession, which he relied upon, that is the theory the jury heard.

Based on the foregoing, we hold that the district court did not abuse its discretion in refusing to admit the testimony of Martinez and Whitt and did not prevent Bautista from presenting a defense.

**AFFIRMED**.