# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00202-CR

**Robert Saint James, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. 3040112, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The jury convicted appellant Robert Saint James of the offense of felony murder. *See* Tex. Pen. Code Ann. § 19.02(b)(3) (West 2003). Punishment was assessed at fifty years' confinement. In five issues on appeal, Saint James challenges the district court's denial of his motion to suppress his confession and asserts ineffective assistance of counsel. We will affirm.

## BACKGROUND

The jury heard evidence that, between 12:30 and 1:00 a.m. on November 20, 1982, the body of 20-year-old Dallas resident Mark Dougherty was found along IH-35 near the Slaughter Creek overpass in Austin. Police officers who discovered Dougherty testified that he was bloodied and barely alive when they found him, and that he was ultimately "pronounced dead on the scene."

One of the officers testified that Dougherty was found covered in "scrub-type brush" that indicated to him that someone had tried to hide the body. An autopsy revealed that Dougherty died from massive loss of blood from stab wounds to his neck.

During their investigation into Dougherty's death, police began looking for Saint James and Don Bouldrey, two individuals who allegedly were supposed to meet with Dougherty on the night he was murdered. Officers first interviewed Bouldrey, but determined that they lacked "enough probable cause" to arrest him.

Sergeant Jerry Fearn of the Austin Police Department testified that, on December 3, 1982, he received a phone call from Saint James, who volunteered that "our investigation was going in the wrong direction, that we were looking for the wrong people and that he could straighten us up." Saint James then asked to meet with Fearn at a restaurant the next morning "to give his version of what happened." Fearn testified that Saint James refused to meet with him at the police station.

Fearn explained that, when he met with Saint James the next day, Saint James told him that "he was a broker. He put people together and admitted that normally these contacts that he arranged were for drug deals." Fearn testified that Saint James also told him that "Don Bouldrey was wanting to expand his business as a drug dealer" and that Bouldrey "was trying to put together a deal with Mark Dougherty" and "Dougherty was supposed to be coming to Austin to buy drugs for his customers in Dallas." Saint James went on to tell Fearn that Dougherty had planned on flying from Dallas to Austin and meeting Saint James at the airport, but that the meeting never happened. Saint James also told Fearn that he had been at his girlfriend's house the night of the murder, and that he had learned from Bouldrey the next day that Dougherty had been murdered. Fearn testified that

2

when he asked Saint James if he thought Bouldrey had been involved in the murder, Saint James responded that "Don wasn't the kind of person that could do something like that."

On December 21, 1982, Sergeant Fearn was contacted a second time by Saint James. This time Saint James told Fearn "that he had been out investigating this murder and had all the information and evidence that we needed to arrest, indict and prosecute Don Bouldrey for Mark Dougherty's murder." This evidence supposedly included a knife that was the murder weapon and a bloody boot that belonged to Bouldrey. Fearn testified that Saint James wanted to be paid $5,000 for this evidence. Believing that this "evidence" would probably be inadmissible at trial, Sergeant Fearn declined the offer. Fearn testified that, on December 23, Saint James called him again and asked for the phone number of Dougherty's father. It appeared to Fearn that Saint James was interested in selling the evidence to Dougherty's family. Fearn did not give Saint James the family's phone number. This was the last time Fearn had contact with Saint James. After that, information about Dougherty's murder "cease[d] to come in" and the case, although never closed, was set aside.

In 1986, Detective Dusty Hesskew, who had assisted with the murder investigation in 1982, decided to follow up on some leads. Hesskew ran a criminal history check on Saint James and discovered that he was in a penitentiary in Colorado. Hesskew testified that he spoke with Gregory Boodakian, a counselor at the Colorado Department of Corrections, who told him that Saint James had been talking to him about Dougherty's murder. Boodakian took a taped statement from Saint James, transcribed it, and sent it to Hesskew. In the statement, Saint James explained his version of the events surrounding Dougherty's murder, giving a "very graphic description of the

3

crime scene" and acknowledging that he was present when the crime occurred. In the statement, Saint James also admitted to assisting Bouldrey in hiding some of the evidence related to the murder. Based on the contents of this statement, Hesskew "put the case together and . . . presented it to the District Attorney's Office for their review." Hesskew thought he had enough information to "get the case before a grand jury." Hesskew did not know what happened to the case after he turned the evidence over to the district attorney's office. It is undisputed that the district attorney's office decided not to prosecute the case at that time.

The case was later reviewed in 2001 by the Austin Police Department's cold case unit. Detective Rick Blackmore examined Saint James's 1986 statement and began looking for him. He found Saint James in Arizona. Detective Donald Byers, a police detective with the City of Mesa, Arizona, was asked by Blackmore to speak with Saint James about Dougherty's murder. Byers asked Saint James to come into the Mesa police station and make a statement, which he did on December 15, 2002. The statement was recorded and sent to Austin. Based on the information in the statement, Detective Blackmore decided to go to Arizona and interview Saint James himself.

Detective Blackmore and his partner Detective Hardesty first interviewed Saint James on February 12, 2003. Blackmore testified that Saint James "voluntarily came to the Mesa, Arizona Police Department" and gave a statement about his involvement in the murder. The meeting lasted "about seven-and-a-half hours." Blackmore testified that, although there were some differences between Saint James's statement to Detectives Blackmore and Hardesty and his 1986 statement to Boodakian, "It was still a relatively consistent story in that he was negotiating the sale of this MDA

4

product or love drug that he and Mr. Bouldrey had begun producing and was trying to negotiate that sale to Mr. Dougherty." When asked about the inconsistencies in the statements, Blackmore testified:

> A lot of it involved—from my perspective, a lot of it involved the discussion between Mr. Bouldrey and Mr. Saint James. And at some point on the first day Mr. Saint James told us that Mr. Bouldrey told Saint James that he was going to get Mark's money. And that began sounding more to me as though they intended to rob him. The first day Mr. Saint James continued to deny that. But as I said before, I felt like and Detective Hardesty both felt that he was minimizing his involvement.

Blackmore and Hardesty requested a second interview with Saint James the following day. Saint James agreed. Blackmore testified that during the second interview on February 13, Saint James told them that:

> [H]e actually had preplanned the robbery with Mr. Bouldrey. He had knowledge that it was going to be a robbery and that he actually instructed Mr. Bouldrey to strike Mr. Dougherty on the head with his motorcycle helmet. The intent was to knock him out, take his money and leave him on the side of the road.

Saint James's confession was videotaped and reduced to written form. After taking the statement, Detectives Blackmore and Hardesty returned to Austin and continued to investigate the murder. Blackmore testified that the investigation into Bouldrey's involvement was still ongoing.

On April 16, 2004, Saint James was indicted for Dougherty's murder, committed in the course of robbery. The jury was instructed on the law of parties and found Saint James guilty, assessing punishment at fifty years' confinement and a fine of $5,000. This appeal followed.

5

**DISCUSSION**

**Motion to suppress**

In his first issue, Saint James contends that the district court erred in denying his motion to suppress his February 12 and 13, 2003 statements to Detectives Blackmore and Hardesty.

In his motion to suppress, Saint James asserted that his "confession cannot be considered truly voluntary because he was not informed of his right to have an attorney present during the interrogation as per *Miranda*."[1]  After holding a hearing on Saint James's motion to suppress, the district court disagreed, finding that Saint James "voluntarily came to the February 12, 2003, interview and agreed to return on February 13, 2003, to summarize and reduce to writing the substance of the interview."  The district court made the following findings:

> At all times during the interview on February 12-13, 2003, the defendant was not under arrest and was free to leave.
>
> The defendant freely and voluntarily made the electronically recorded and written statement.
>
> The electronically recorded and written statement were [sic] not the result of custodial interrogation.

We apply a bifurcated standard of review to an order granting or denying a motion to suppress, giving almost total deference to a trial court's determination of historical facts and reviewing *de novo* the court's application of the law.  *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000).  The district

---

[1]  *See Miranda v. Arizona,* 384 U.S. 436 (1966).

6

court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and it may choose to believe or disbelieve any or all of a witness's testimony. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003); *Wood v. State*, 18 S.W.3d 642, 646 (Tex. Crim. App. 2000); *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim. App. 1993); *Allridge v. State*, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991).

Saint James asserts that his February 12 and 13 statements should have been suppressed because they were the result of an impermissible "question-first" interrogation tactic.[2] Saint James compares his statements to the statements made by the defendant in *Missouri v. Seibert*, 542 U.S. 600 (2004). In *Seibert*, the suspect was taken to the police station and left alone in an interview room for 15 to 20 minutes. *Id*. at 604. Without giving *Miranda* warnings, an officer entered the room and questioned Seibert for 30 to 40 minutes—"squeezing her arm" in the process— and eventually obtained a confession. *Id*. at 605. The officer then left the interview room, returned 20 minutes later with a tape recorder, gave Seibert the *Miranda* warnings, and began asking her to repeat the same information she had previously told the officer. *Id*. Concluding that this "question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted," the Supreme Court held that Seibert's post-*Miranda* statements were inadmissible. *Id*. at 617.

---

[2] The "question-first" interrogation tactic involves successive interrogations of a suspect, both before and after warning him of his *Miranda* rights. *Missouri v. Seibert*, 542 U.S. 600, 609 (2004). Only after a confession is obtained are the *Miranda* warnings given, and then the officer asks the suspect to repeat his confession, in the belief that the incriminating statements given subsequent to the *Miranda* warnings will be admissible. *See id*. at 609-10.

7

This case is distinguishable from *Seibert*, primarily because the statements obtained by Detectives Blackmore and Hardesty on February 12 and 13 were not the product of custodial interrogation. The requirements of *Miranda* apply only to statements made during custodial interrogation. *See Miranda v. Arizona*, 384 U.S. at 478 (volunteered statements not barred by Fifth Amendment); Tex. Code Crim. Proc. Ann. art. 38.22, § 5 (statute does not preclude admission of statement that does not stem from custodial interrogation)

A person is in custody if, under the totality of the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996); *Houston v. State*, 185 S.W.3d 917, 920 (Tex. App.—Austin 2006, pet. ref'd). The initial determination of custody depends on the objective circumstances of the interrogation, not the subjective views of the police or the person being questioned. *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 254; *Houston*, 185 S.W.3d at 920. The subjective views of the police regarding custody may be relevant as a circumstance of the interrogation if they are conveyed to the individual being questioned, but only to the extent that the communication of those views would affect a reasonable person's understanding of his freedom of action. *See Stansbury*, 511 U.S. at 325; *Dowthitt*, 931 S.W.2d at 254; *Houston*, 185 S.W.3d at 920. Stationhouse questioning is not, in and of itself, custodial. *Dowthitt*, 931 S.W.2d at 255; *Houston*, 185 S.W.3d at 920; *see Oregon v. Mathiason*, 429 U.S. 492, 496 (1977). But "the mere fact that an interrogation begins as non-custodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation." *Dowthitt*, 931 S.W.2d at 255.

8

In the hearing on the motion to suppress, Detective Blackmore testified that before he interviewed Saint James, Saint James initiated contact with him, leaving a message on the detective's voice mail indicating that he wanted to speak with him about the murder:

Q: What message did the defendant leave on your voice mail?

A He said, "Maybe the first thing I need to say is Merry Christmas. Saint James, Robert A.," there is a sigh, then he says "murder contest, lots of years ago, Don Bouldrey. Give me a call. I can't give you a phone number, but I have got to touch base with you. Homicide detectives here in Mesa touched with me. Like I said, Merry Christmas."

After receiving this message, Detective Blackmore testified that he arranged for a "non-custodial meeting" with Saint James. Detective Blackmore then provided the following details about the meeting:

Q: Now where did you meet with the defendant on February 12, 2003?

A: At the Mesa, Arizona Police Department.

Q: And how is it that the defendant arrived at that location?

A: He drove himself from home.

Q: And was this a non-custodial interview?

A: Yes, sir.

Q: Was the defendant told at different points in time that he was free to leave?

A: He was told numerous times that he was not under arrest, that we had no intention of arresting him there at that time, that he could talk to us and he was free to leave at any time that he wished.

9

After the interview on February 12th, Saint James left the police station and returned to his home, agreeing to return the following morning:

Q: Did the defendant leave the police station?

A: Yes. Detective Hardesty actually asked Mr. Saint James if he would be willing to return to the police station the next morning and talk to us further about the matter. He agreed to. We all left and we went to our hotel and Mr. Saint James went home.

Q: Did he voluntarily return on the 13th?

A: He did.

Detective Blackmore went on to explain that during the meeting on February 13, Saint James confessed to his involvement in the robbery without any questioning from the detectives:

Q: What happened when he arrived on the 13th?

A: Almost immediately we had gathered back in the interview room and after we got together Mr. Saint James told us that he had done some thinking overnight and he had something that he wanted to tell us. He asked us to sit down, be quiet and not interrupt him and give him the opportunity to speak.

Q: What did he reveal at that point?

A: He told us at that point that he was involved, that he had actually participated in the planning of the robbery of Mr. Dougherty. . . .

Q: After he gives you that initial bit of new information, was he nevertheless still in a non-custodial setting?

A: Yes, sir.

Q: Was he placed under arrest at that point or anything?

A: No, sir.

10

Q: Did the interview continue?

A: It did.

Q: In some detail did he ultimately provide a written statement?

A: Yes, he did.

Q: Did you give him *Miranda* warnings prior to the obtaining of the written statement that could be described as a confession?

A: Yes.

. . . .

Q: And the written statement itself contains the *Miranda* warnings?

A: It does.

. . . .

Q: Were these voluntary statements?

A: Yes, sir.

Q: Was he in custody at the time that he gave these statements?

A: No, sir.

Q: At the conclusion of all his statements, did he in fact leave the police station?

A: He did.

Q: He was free to leave?

A: And he did, yes, sir.

Saint James also testified during the hearing on the motion to suppress. After testifying that he was not given his *Miranda* warnings until the end of his interview on February 13, he explained that, for most of the interview, he did not believe he was in custody:

11

Q: Finally, were you told that you could walk out and terminate at any time?

A: I've got to admit, Byers and Detective Blackmore are pretty good cops and they made very clear to me that I could leave at any point at any time.

Q: From your point of view, did you feel like you were being treated as a suspect or a witness?

A: I'm not going to be here to dent anybody's fenders, but I was there to help the cops out—basically a bad word, help the police department out as just a conversation, not as a witness, not as somebody that has to be under the *Miranda* rights. I was there to help the cops out, the police department, if you wish. I was there having a conversation with some men that needed some help. That's my situation.

Saint James went on to testify that it was not until after the detectives gave him his *Miranda* warnings that he believed he was "in a very tight spot."[3]

Based on the totality of the circumstances surrounding the February 12 and 13 interviews, we find that there is sufficient evidence in the record to support the district court's findings that Saint James was not under arrest and was free to leave, that his statement was freely and voluntarily made, and that the statement was not the result of custodial interrogation. Saint James initiated contact with Detective Blackmore, asking to speak with him about the murder. Although the interview was at the police station, Saint James drove himself to the station, and the

---

[3] We note that the reading of *Miranda* warnings does not transform a noncustodial setting into custodial interrogation. *See United States v. Bautista*, 145 F.3d 1140, 1148 (10th Cir. 1998); *Sprosty v. Buchler*, 79 F.3d 635, 642 (7th Cir. 1996); *Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) (to hold that *Miranda* warnings create custody "would convert admirable precautionary measures on the part of officers into an investigatory obstruction"); *United States v. Charles*, 738 F.2d 686, 693 n.6 (5th Cir. 1984). However, the giving of *Miranda* warnings is a factor in the determination of whether a reasonable person would believe that he is under arrest. *See Bautista*, 145 F.3d at 1148; *Sprosty*, 79 F.3d at 642. Moreover, there may be "circumstances where a clash of wills over a suspect's desire to remain silent would create custody through overbearing police behavior." *Davis*, 778 F.2d at 172 n.1. There is no evidence of "overbearing police behavior" in this case.

detectives repeatedly informed Saint James that he was not under arrest, that they had no intention of arresting him at that time, and that he was free to leave. In fact, Saint James freely left the police station after both the February 12 and February 13 interviews and went home. There is also no evidence of any coercive behavior on the part of the detectives. Furthermore, when Saint James arrived at the police station on February 13, he confessed to his involvement in the robbery without any questioning from the detectives. In fact, he told them "to sit down, be quiet and not interrupt him and give him the opportunity to speak." This is clearly not the type of situation the Supreme Court disapproved of in either *Miranda* or *Seibert*. *See Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). We conclude that the district court did not abuse its discretion in denying Saint James's motion to suppress. We overrule Saint James's first issue.

**Ineffective assistance of counsel**

In issues two, three, four, and five, Saint James asserts that trial counsel was ineffective for: (1) failing to move to suppress the 1986 Colorado prison statement; (2) failing to move to suppress the December 2002 statement made to Detective Byers in Arizona; (3) failing to object to portions of the 1986, 2002, and 2003 statements which mentioned Saint James's prior incarcerations and past drug activities; and (4) failing to request a jury instruction on the issue of the voluntariness of Saint James's statements to the police.[4]

---

[4] Saint James filed a motion to abate this appeal and remand for a hearing on whether trial counsel was ineffective. Saint James's appointed appellate counsel filed a motion for new trial but did not raise ineffective assistance of counsel claims because "the Reporter's Record had not been prepared within the time frame for filing a new trial motion and counsel could not have known of the existence of these issues prior to reviewing the Reporter's Record."

13

Ineffective assistance of counsel claims are evaluated under the two-part test formulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), requiring a showing of both deficient performance and prejudice. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. 2005). A *Strickland* claim must be "firmly founded in the record" and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped. *Id*. at 813-814. "This is true with regard to the question of deficient performance—in which counsel's conduct is reviewed with great deference, without the distorting effects of hindsight—where counsel's reasons for failing to do something do not appear in the record." *Goodspeed*, 187 S.W.3d at 392. We have said that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). Absent such an opportunity, an appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001).

---

Texas Rule of Appellate Procedure 2 authorizes an appellate court, on a party's motion or on its own initiative, and in order to expedite a decision or for other good cause to "suspend a rule's operation in a particular case and order a different procedure; but a court must not construe this rule to suspend any provision of the Code of Criminal Procedure . . . ." Tex. R. App. P. 2. A court of appeals may not use Rule 2 to suspend or enlarge appellate limits that regulate the orderly and timely process of moving a case from trial to finality of conviction. *Oldham v. State*, 977 S.W.2d 354, 359 (Tex. Crim. App. 1998).

Saint James has not shown good cause for this Court to suspend the rules of appellate procedure and allow him to file a new motion for new trial. Accordingly, Saint James's motion to abate appeal and remand for a hearing is denied. *See Pettway v. State,* 4 S.W.3d 390, 391 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

14

To show prejudice, "appellant must show a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002). "In other words, the appellant must prove counsel's representation so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Hall v. State*, 161 S.W.3d 142, 152 (Tex. App.—Texarkana 2005, pet. ref'd) (citing *Strickland*, 466 U.S. at 686). If, however, "there is at least the possibility that the conduct could have been legitimate trial strategy," then we must "defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Id*. (quoting *Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003)).

### *1986 Colorado statement*

Saint James first asserts that counsel was ineffective for failing to make a motion to suppress the 1986 statement Saint James made while in prison in Colorado because it was made involuntarily. Regardless of the merits of this assertion, we conclude that counsel's decision not to object to the admission of this statement reasonably could be considered legitimate trial strategy. The 1986 statement was consistent with Saint James's trial testimony. In the statement, Saint James claimed he was simply the negotiator for a drug transaction and that Bouldrey was responsible for the robbery and murder. Given the incriminating nature of Saint James's subsequent statements to police, counsel may have wanted the 1986 statement to come in as evidence supporting Saint James's theory of the case—that he was not responsible for Dougherty's death.

15

### *Evidence of prior incarcerations and past drug activity in all statements*

Saint James also contends that counsel was ineffective for failing to object to portions of his 1986, 2002, and 2003 statements that referenced prior incarcerations related to drug offenses. We conclude that counsel reasonably could have anticipated that this evidence would come in anyway. While evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* Tex. R. Evid. 404(b). The robbery and murder arose out of a drug transaction. Evidence related to Saint James's prior involvement with drugs was directly related to this offense. Additionally, Saint James's defense was that he was merely a negotiator for a drug transaction. Evidence that he was previously involved in drugs was relevant to that defense. We thus find it highly unlikely that, even if trial counsel had objected to the references to prior incarcerations and past drug activity, the district court would not have allowed the evidence to be admitted.

### *December 2002 statement*

Saint James also asserts that counsel was ineffective for failing to make a motion to suppress the statement he made to Detective Byers in December 2002. Although Saint James admits that this statement was made voluntarily, he contends it should have been suppressed because it contained references to the 1986 statement and also to past drug offenses. As we discussed above, counsel reasonably could have wanted the 1986 statement to be admitted. If that was his trial strategy, it could also be part of his strategy not to object to portions of the 2002 statement that

16

referred to the 1986 statement. We also do not believe counsel was ineffective for failing to object to the references to past drug offenses, for the reasons described above.

### *Jury instruction on voluntariness*

Saint James further contends that counsel was ineffective for failing to request a jury instruction on the voluntariness of his confession. Saint James cites this Court's opinion in *Vasquez v. State*, 179 S.W.3d 646 (Tex. App.—Austin 2005, pet. granted), in which we held—for the first time—that "a defendant may be entitled to an instruction on voluntariness even if the facts surrounding his confession are undisputed. An instruction must be given if a reasonable jury, viewing the totality of the circumstances, could have found that the statement was not voluntarily made." *Id.* at 662. We first note that *Vasquez* was not decided until over a year after Saint James's trial. Counsel cannot be expected to comply with a decision that was not handed down until well after his representation of his client ended. *See Vaughn v. State*, 931 S.W.2d 564, 568 (Tex. Crim. App. 1996) ("An ineffective assistance of counsel claim cannot be based on an alleged error of counsel when the caselaw evaluating counsel's actions and decisions in that instance was nonexistent or not definitive"). We also note that *Vasquez* did not involve a claim of ineffective assistance of counsel, and thus the decision did not address the circumstances in which counsel has an obligation to ask for such an instruction.

Furthermore, even assuming trial counsel's performance was deficient for failing to request a jury instruction on voluntariness, Saint James has failed to show that, but for this error, the result of the proceeding would have been different. There is enough evidence in the record from which a rational jury could conclude that Saint James's confession was voluntary. Saint James has

17

failed to demonstrate a reasonable probability that, if the jury had been instructed on voluntariness, the jury would not have found his confession to be voluntary.

For the reasons stated, we conclude that trial counsel was not ineffective. We overrule Saint James's second, third, fourth, and fifth issues.

## CONCLUSION

Having overruled Saint James's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   August 31, 2006

Do Not Publish