**UNITED STATES of America,
Plaintiff,**

v.

**Ahed HBAIU, Defendant.**

**No. 01–40075–01–JAR.**

United States District Court,
D. Kansas.

Feb. 26, 2002.

Randy M. Hendershot, Office of United States Attorney, Topeka, KS, for Plaintiff.

Michael S. Holland, Holland & Holland, Russell, KS, for Defendant.

### MEMORANDUM ORDER GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS

ROBINSON, District Judge.

On February 11, 2002, the Court held a hearing on defendant's motion to suppress all evidence seized from the search of a U–Haul trailer and all statements made subsequent to his request for a lawyer. Having reviewed the evidence and arguments presented by the parties, the Court is now prepared to rule.

#### Facts

On July 16, 2001, defendant Ahed Hbaiu and Kevan Kneuker were passengers in a sports utility vehicle driven by Phillip Esposito, traveling east on I–70 in Russell County, Kansas. The vehicle was a rental car and was towing a rental U–Haul trailer. The vehicle passed Trooper Lytton parked on the eastbound shoulder. Lytton pulled into the inside lane and overtook defendant's vehicle, then changed lanes to be in front of the vehicle. Lytton

testified that he ran a check on the vehicle's license tag and learned it was a California rental vehicle. He then slowed down and pulled off onto the shoulder, allowing the vehicle to pass. Then Lytton pulled into the outside lane and followed the vehicle for approximately four miles.

Hbaiu testified that as they approached the Wilson Lake exit, the men decided to "go to the lake and rest." Trooper Lytton also exited and followed them approximately ten miles to Wilson Lake. He did not use his lights or siren. Lytton turned on the patrol car's videotape but not the audio portion of the tape. Esposito did not commit any traffic violations while Lytton followed the vehicle.

At approximately 5:15 p.m., Esposito pulled off the road and parked, near the place where the road dead ended at the lake front. As the men exited the vehicle, Trooper Lytton asked them to stay in the vehicle. At this time, Lytton turned on the audio portion of the videotape and approached the vehicle.

Trooper Lytton asked the men what they were doing. Hbaiu told Lytton that they had pulled off to rest. He told the trooper that they had vacationed in California for a week and were moving his sister from California to Kansas City. Lytton asked the men for their driver licenses and the rental agreements for the vehicle and the trailer. The rental agreements indicated that the vehicle and the trailer were to be returned to California on July 19, 2001, three days later. Lytton noticed that there was only one bag in the back of the vehicle, and no other luggage.

Lytton told the men to wait, and returned to the patrol car with the licenses and rental agreements. Neither of the rental agreements was in the name of any of the three men. Dispatch informed Lytton that Esposito's license was suspended and that he had a criminal record. Hbaiu gave Lytton a driver's license that Lytton suspected was not Hbaiu's. This license later proved to be the license of Hbaiu's brother.

After waiting approximately 20 minutes for backup to arrive, Trooper Lytton returned to the vehicle and asked permission to search the trailer, which was granted. Lytton did not return the driver's licenses or rental agreement. Hbaiu got out of the vehicle and spent over ten minutes searching for the key to the trailer; Hbaiu did not find or present the key. Lytton asked whether or not the men had any contraband, weapons or drugs in the car. Hbaiu accused Lytton of racial profiling, whereupon Lytton made statements about going to jail and ordered him back into the vehicle.

At the time of this incident, Trooper Lytton was a relatively new trooper, with only three months of experience patrolling alone. He contacted Trooper Rule, a more experienced trooper, and they conferred by cell phone. Trooper Rule told Trooper Lytton that he thought the circumstances were suspicious enough to justify temporary detention, until Rule could bring his drug dog to the scene. Trooper Lytton then asked the men if they would mind staying so a drug dog could sniff the trailer; the men responded he could bring "sixty dogs to sniff" since there was nothing in the trailer. At the time he made this request, Lytton still had custody of the men's driver's licenses and the rental agreements. Lytton denied the men's request to go down to the lake, but allowed them to play soccer while waiting for Trooper Rule and the dog to arrive.

By the time the Trooper Rule and the drug dog arrived, eighty minutes had elapsed since Esposito stopped the vehicle there at Wilson Lake. Rule testified that he drove directly to Wilson Lake from where he had been working on a search warrant, arriving at approximately 6:35

p.m. Trooper Lytton gave Rule driving directions to the scene. Lytton acknowledged that there was a shorter route, on gravel roads, but he believed Rule could arrive as quickly on the paved route that Lytton advised Rule to take. This area of western Kansas is not heavily inhabited and the troopers patrol a wide area. The nearest drug dog was the dog with Trooper Rule.

Trooper Rule and his drug dog, Budkis, are certified in drug detection and Rule is also a certified instructor in drug dog detection. Rule testified that Budkis had a 90% reliability rate in training and street utilization. Rule further testified that Budkis was a "passive" indicating dog, meaning it would sit when it detected drugs; in contrast, an "aggressive" indicating dog barks and scratches when it alerts. Rule testified and the videotape depicts, that Rule had Budkis walk around the trailer, and that Budkis alerted, by sitting at the rear corner of the trailer. The audio portion of the tape was off briefly, during this critical time. There were other short segments of the tape where the audio portion was off, or according to Trooper Lytton, was malfunctioning. Hbaiu contends that Rule ordered Budkis to "sit;" both Rule and Lytton deny this. Rule also denied Hbaiu's accusation that Rule had directed Budkis with a hand signal. The videotape does not depict Rule giving Budkis a hand signal.

The audio portion of the tape commenced again shortly after Budkis alerted to the trailer, but before the troopers opened the trailer. Review of the videotape reveals that Hbaiu told Trooper Lytton "we want a lawyer here." Lytton testified that if he had heard Hbaiu's request for a lawyer, he would have stopped any questioning. Although Lytton testified that he did not hear Hbaiu's request at that time, the videotape impeaches Lytton's testimony. Lytton clearly responded

to Hbaiu's request, "we want a lawyer here," by stating, "I haven't arrested you yet." Lytton and Rule testified that they could not have heard Hbaiu's request for a lawyer, because all three men were yelling and creating a commotion at that time. But, the videotape reveals that when Hbaiu made the request, he was the only one speaking. There was no commotion and no yelling until later, when Kneuker became upset because he was having a diabetes-related episode.

The troopers waited approximately 15 minutes for someone to bring bolt-cutters to cut the lock on the trailer. When the men tried to sit in the vehicle, one of the troopers told them to get back in front of the car or "you're going to jail." While waiting, the men continued to argue with the troopers about whether Trooper Rule told the dog to sit. Trooper Lytton told the men that "you guys better get your stories straight before you go to court."

When the bolt-cutters arrived at approximately 7:00 p.m., the troopers opened the trailer and discovered ketamine. The troopers place Hbaiu under arrest after the trailer was opened, but Hbaiu was not *Mirandized* until approximately one hour later, after he was transported to the sheriff's office. Trooper Lytton read Hbaiu his rights; both Lytton and Trooper Rule were present for questioning. Hbaiu testified that he did not reiterate his request for a lawyer at that time. Lytton and Rule testified that Hbaiu did not request a lawyer after being read his rights, and that he waived his rights.

During the interrogation, Hbaiu told the troopers that he and the other men were paid $5,000 each to transport the trailer from California to New York, where they were to leave it parked on a street near Columbia University with the keys in the ignition. But at the suppression hearing, Hbaiu testified that he made up this story

out of fear the other men would collaborate a false story against him. Hbaiu also testified that the story about moving his sister to Kansas City was not true; his sister lives in southern California.

Hbaiu is charged with possession with intent to distribute approximately 2100 lbs. of Ketamine in violation of 21 U.S.C. 841(1)(1).

## Analysis

### 1. Hbaiu's standing.

The government contends that Hbaiu does not have standing to contest the search because he was not the driver, owner, nor the renter of the vehicle or trailer. In fact, none of the occupants were authorized drivers under the rental agreement.

It is well established that passengers have no reasonable expectation of privacy in a vehicle when the passenger neither asserts a proprietary or possessory interest in either the vehicle or its contents.[1] However, it is recognized that persons do not shed their individual interests in being free from unlawful seizures merely because they are traveling as passengers in automobiles.[2] Therefore, unlike a driver or owner of a vehicle, as a passenger, Hbaiu may not directly challenge the search of the vehicle.[3] Instead, Hbaiu may only challenge his detention. Hence, the issue for the court is two-fold: (1) whether Hbaiu was unlawfully detained; and (2) whether the seized evidence and the statements obtained were the fruit of the unlawful detention.[4]

### 2. Initial Stop.

The Fourth Amendment protects individuals from unreasonable searches and seizures.[5] An unconstitutional seizure may render an otherwise constitutional search invalid under the Fourth Amendment if the search resulted from the illegal seizure or detention.[6]

As established by Supreme Court precedent, there are three general types of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, [which are] the most intrusive ... and [are] reasonable only if supported by probable cause." [7]

■■■ Hbaiu challenges the legality of the initial traffic stop. But this was not a traffic stop at all. Trooper Lytton did not exert police power until he approached the vehicle after Esposito voluntarily stopped by the side of the road. Lytton merely followed the vehicle after it exited the

---

1. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

2. *See United States v. Eylicio–Montoya*, 70 F.3d 1158, 1163 (10th Cir.1995).

3. The Court notes that use of a drug dog to walk around the exterior of a defendant's car does not escalate the traffic stop into a search. *See City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). Consent is not required for a dog sniff of a law fully detained vehicle. *U.S. v. Diaz–Bor jas*, 188 F.3d 519 (10th Cir.1999). A canine sniff of an already legitimately detained automobile is not a 'search' within the meaning of the Fourth Amendment. *U.S. v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998).

4. *United States v. Miller*, 84 F.3d 1244, 1250 (10th Cir.1996), overruled on other grounds by *United States v. Holland*, 116 F.3d 1353 (10th Cir.1997).

5. U.S. Const. amend IV.

6. *United States v. Miller*, 84 F.3d at 1250 (10th Cir.).

7. *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir.1996) (citations omitted).

highway. Lytton did not turn on the patrol car's siren or lights. And, Esposito chose to stop the vehicle and park when he reached the end of the road, although there was a turn around circle that would have allowed Esposito to continue traveling back towards the highway. The fact that the trooper "followed" the vehicle down the road to the lake does not constitute a Fourth Amendment seizure.[8] The trooper did not stop the vehicle. Esposito did.

■ Even if the initial contact was actually a stop, Trooper Lytton had a reasonable suspicion of criminal activity justifying the stop. He knew that a California rental vehicle was towing a California rental trailer, which is typically in violation of a rental car agreement. He found it suspicious that the men took this exit after he started following the vehicle. This exit and area had no interstate amenities. He testified that he found suspicious an out of state trailer being pulled to Wilson Lake; he speculated that there might be a dead body or contraband involved. He also testified that when he initially passed the vehicle, the three men "studiously avoided" eye contact with him.

A stop can be supported as an investigative stop on the basis of the trooper's reasonable suspicion that the occupants were involved in criminal activity.[9] Reasonable suspicion is one that would " 'warrant a man of reasonable caution in the belief' that [a stop] was appropriate." [10] "The officer [making a *Terry* stop] ... must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' "[11] The Fourth Amendment requires 'some minimal level of objective justification' for making the stop.[12] That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means " 'a fair probability that contraband or evidence of a crime will be found,' [13] and the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause." [14] The court considers both the quantity and quality of the evidence when evaluating whether there is reasonable suspicion.

The government bears the burden to show that an officer possessed articulate reasonable suspicion.[15] Whether an officer possessed the requisite articulate suspicion depends on the totality of the circumstances.[16] Although the Court does not find that this was a traffic stop, even if it was, the government has met its burden of showing that Trooper Lytton had a reasonable suspicion supporting a stop.

### 3. Length and Scope of the Investigative Detention.

■ Even if the initial stop of defendant's vehicle was legitimate, the detention

**8.** *United States v. Klinginsmith,* 25 F.3d 1507, 1510 (10th Cir.) (citation omitted), *cert. denied* 513 U.S. 1059, 115 S.Ct. 669, 130 L.Ed.2d 602 (1994).

**9.** *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (*citing Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889, (1968)).

**10.** *Terry,* 392 U.S. at 22, 88 S.Ct. 1868 (1968) ( *quoting Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)).

**11.** *Terry,* 392 U.S. at 27, 88 S.Ct. 1868.

**12.** *I.N.S. v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).

**13.** *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**14.** *United States v. Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581.

**15.** *United States v. Carhee,* 27 F.3d 1493, 1496 and n. 2 (10th Cir.1994).

**16.** *United States v. Salzano,* 149 F.3d 1238, 1242 (10th Cir.1998), *opinion amended and superseded* at 158 F.3d 1107 (10th Cir.1998).

must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[17] "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'"[18] It must be temporary, and its scope must be carefully tailored to its underlying justification.[19] Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.[20]

A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[21]

If an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.[22] However, this initial detention never became a consensual encounter. Retention of a motorist's driver's license and/or other pertinent documents by the officer during any questioning renders an encounter not consensual, until such time as the documents are returned.[23] The Tenth Circuit has consistently held "that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him."[24] Lytton did not return the rental agreements or the driver's licenses of the three men. In fact, given the highway patrol policy to not return suspended licenses or rental agreements to those other than whose name appears on the rental agreement, Lytton testified that he never returned the licenses or rental agreements.

■ There being no consensual encounter, the extended detention of Hbaiu is lawful only if the troopers had a reasonable and articulable suspicion of criminal activity.[25] A variety of factors may contribute to the formation of an objectively reasonable suspicion of illegal activity. Among those factors that have justified further questioning are having no proof of ownership of the vehicle, having no proof of authority to operate the vehicle, and inconsistent statements about destination.[26] In particular, a driver's inability to

**17.** 392 U.S. at 20, 88 S.Ct. 1868.

**18.** *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

**19.** *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997).

**20.** *Patten*, 183 F.3d at 1193; *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir. 1997).

**21.** *United States v. Hunnicutt*, 135 F.3d at 1349.

**22.** *See United States v. Walker*, 933 F.2d 812, 816–17 (10th Cir.1991) *cert. denied*, 502 U.S.

1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992).

**23.** *See id.* at 817.

**24.** *United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.), *cert. denied*, 511 U.S. 1095, 114 S.Ct. 1862, 128 L.Ed.2d 484(1994); *accord United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir.1995).

**25.** *See United States v. Turner*, 928 F.2d 956 (10th Cir.) *cert. denied* 502 U.S. 881, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991).

**26.** *See United States v. Jones*, 44 F.3d 860, 872 (10th Cir.1995); *Gonzalez–Lerma*, 14 F.3d at 1483–84; *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied*, 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991).

offer proof of ownership or authorization to operate the vehicle has figured prominently in many Tenth Circuit cases upholding further questioning.[27] And, none of the three men had proof that they were authorized to drive the vehicle or possess the trailer. None of their names appeared on the rental agreements as the person renting the vehicle or a person authorized to possess or operate the vehicle.

In addition to that factor, which strongly weighed in favor of further investigative detention, Lytton testified that his suspicion of criminal activity was further based on these facts:

- two rental vehicles, occupied by three males from two different states; rental companies do not, as a matter of practice, allow towing
- driver Esposito had a suspended license
- passenger Hbaiu gave him a license that did not appear to be his
- the men had told him an improbable story: that they had gone to California to vacation and were driving the vehicle from California to Kansas City to

help Hbaiu's sister move; yet the rental agreements showed that the vehicles needed to be returned to California in three days. Furthermore, the fact that there was only one bag visible in the vehicle, made their story about vacationing in California and now driving to Kansas City seem implausible

- Hbaiu granted him consent to search, but could not produce a key to the trailer in ten minutes

The Court concludes that these factors sufficiently caused the troopers to have a reasonable suspicion of criminal activity that justified a prolonged investigative detention. This investigative detention was quite prolonged. Approximately one hour, forty-five minutes elapsed from the time that Esposito stopped the vehicle until the time that the ketamine was seized and Hbaiu was arrested. Lesser waiting periods have withstood challenge.[28]

One hour, forty-five minutes is a length of time that in many circumstances may exceed the constitutional bounds of an investigative detention. In this instance, the

---

**27.** See United States v. Horn, 970 F.2d 728, 732 (10th Cir.1992); United States v. Turner, 928 F.2d at 959; United States v. Arango, 912 F.2d 441, 447 (10th Cir.1990), cert. denied, 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991); see also United States v. Fernandez, 18 F.3d 874, 879 (10th Cir.1994) (The "defining characteristic of our traffic stop jurisprudence is the defendant's lack of ... some ... indicia of proof to lawfully operate and possess the vehicle in question, thus giving rise to objectively reasonable suspicion that the vehicle may be stolen.")

**28.** See United States v. Villa–Chaparro, 115 F.3d 797, 802–03 (10th Cir.), cert. denied, 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997) (extended detention of almost forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment); United States v. Garcia, 52 F.Supp.2d 1239 (D.Kan.1999) (finding a delay of 40 minutes not unreasonable where supported by reason-

able suspicion, even where the driver was being detained against his will.); United States v. Alpert, 816 F.2d 958 (4th Cir.1987) (upholding 50 minute detention); United States v. Hardy, 855 F.2d 753, 760 (11th Cir. 1988) cert. denied 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989); United States v. $64,765.00, 786 F.Supp. 906, 912 (D.Or. 1991); Cf. United States v. Place, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110(1983) (declining to adopt "outside time limitation" for permissible Terry stop, but admonishing prior to Sharpe that 90 minutes is probably too long for a Terry stop); United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (holding that in distinguishing a true investigative stop from a de facto arrest, the court must not adhere to "rigid time limitations" or "bright line rules."); United States v. Borys, 766 F.2d 304, 313 (7th Cir.1985) (75–minute detention was "at the outer bounds of the Constitution");

delay is attributable to a number of circumstances that were outside of the troopers' control. The fact that the men made up an elaborate story about the purpose and details of their trip attributed to some delay. Also, the ten minutes Hbaiu spent looking for the key to the trailer attributed to the delay in Lytton's calling for Rule and the drug dog. The fact that Esposito had a suspended license and that the license produced by Hbaiu was suspect attributed to some delay in the investigative detention. And, when these factors led Lytton to request a drug dog, considerable delay is attributable to Lytton waiting on Rule and the drug dog to arrive from another remote location. The men could not be reasonably found to be free to go, given that Lytton still had their licenses and the rental agreement; but at the same time, Lytton asked if they would wait for the drug dog and they agreed. Hbaiu's failure to produce the key to the trailer attributed in the 15 minute delay in waiting for bolt-cutters to arrive. Given all of these circumstances, the Court does not find the length of detention was unreasonable.

### 4. Request for lawyer.

■ In *Edwards v. Arizona*,[29] the Supreme Court held that if a person in custody requests an attorney, questioning must cease until an attorney is present. Hbaiu contends that after the drug dog alerted to the trailer, he requested a lawyer and that all statements made subsequent to this request must be suppressed. It is undisputed that once the drug dog alerted and the ketamine was seized, Hbaiu was placed under arrest. But was he in custody when he articulated his desire for a lawyer, a statement made shortly after the drug dog alerted and shortly before the troopers opened the trailer and found the ketamine?

"[T]wo requirements must be met before *Miranda* is applicable: the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.' "[30] A person is "in custody" when he as been arrested or his freedom is curtailed to a degree associated with a formal arrest.[31] The relevant inquiry for determining whether an individual is "in custody" is whether a reasonable person in that position would "believe her freedom of action had been curtailed to a 'degree associated with formal arrest.' "[32] A suspect can be placed in police "custody" for purposes of *Miranda* before he has been "arrested" in the Fourth Amendment sense.[33] Consequently, *Miranda* warnings might be implicated in certain highly intrusive "non-arrest" encounters.[34]

Generally, the questioning that occurs during a traffic stop requires no *Miranda* warnings[35] because such police-citizen encounters are brief, non-threatening, and conducted in the presence of others.[36] During a traffic stop, however, law en-

**29.** 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

**30.** *United States v. Perdue,* 8 F.3d 1455, 1463 (10th Cir.1993).

**31.** *See Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam); *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

**32.** *United States v. Griffin,* 7 F.3d 1512, 1518 (10th Cir.1993) (quoting *Beheler,* 463 U.S. at

1125, 103 S.Ct. 3517 and *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

**33.** *Berkemer,* 468 U.S. at 441, 104 S.Ct. 3138.

**34.** *Perdue,* 8 F.3d at 1466.

**35.** *See Martinez,* 983 F.2d at 976 (citing *Berkemer,* 468 U.S. at 442, 104 S.Ct. 3138).

**36.** *See Berkemer,* 468 U.S. at 438–39, 104 S.Ct. 3138.

forcement officials may create the custodial interrogation that *Miranda* contemplates "by employing an amount of force that reache[s] the boundary line between a permissible *Terry* stop and an unconstitutional arrest."[37] The totality of the circumstances must be considered to determine whether the force employed during the traffic stop and prior to formal arrest created a "custody" situation under *Miranda*.[38] While the Tenth Circuit has avoided hard line rules to govern this analysis, several factors have been useful in testing the "atmosphere of custody."[39] First, the court must consider the circumstances relating to the questioning process, such as whether a suspect is informed that he or she may refuse to answer questions or terminate the encounter.[40]

A second factor indicative of a custodial setting is the tone and manner of the questioning, and the separation of an individual from sources or moral support during questioning.[41] While *Terry* type investigations allow for limited questioning to confirm an officer's suspicions,[42] prolonged accusatory questioning is likely to create a "coercive environment from which an individual would not feel free to leave."[43] "Police and suspects should not have to guess as to when custody arises after a temporary stop."[44] Where the nature of the police/citizen encounter progresses beyond a short investigatory stop, a custodial environment is more likely.[45]

A final factor commonly examined is the circumstances showing a "police dominated" atmosphere.[46] Where police are in full control of the questioning environment, custody is more easily found.[47] Circumstances might include: the degree of restraint placed upon the suspect being questioned, including whether the suspect is physically restrained or coerced,[48] threatening presence of several officers,[49] whether the suspect's driver's license or automobile registration is retained,[50] and whether there is a threat of physical restraint created by the officer's display of a weapon.[51]

At the time he asked for a lawyer, could Hbaiu have reasonably believed his situation was the functional equivalent of a formal arrest?[52] "[A] 'reasonable person'

---

37. *United States v. Fields*, 2001 WL 1013308 (D.Kan.2001) (quoting *Perdue*, 8 F.3d at 1464).

38. *See United States v. Torres–Guevara*, 147 F.3d 1261, 1266 (10th Cir.1998).

39. *See Griffin*, 7 F.3d at 1518–19.

40. *Id.*

41. *Id.*

42. *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138.

43. *Griffin* at 1518.

44. *Id.* The court goes on to note that in *Berkemer,* the Court advised the practice of giving *Miranda* warnings at the earliest possible point a police/citizen encounter evolves past a *Terry* stop. *Berkemer*, 468 U.S. at 431–32, n. 13, 104 S.Ct. 3138. "The principal advantage of *Miranda* is as a simple line of demarcation which may benefit a suspect but which ultimately benefits law enforcement in the reduction of unnecessary dispute over suppression of evidence." *Id.* (quoting *Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

45. *Id.*

46. *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138.

47. *Griffin* at 1519.

48. *See Martinez*, 983 F.2d at 977.

49. *See Griffin* at 1519.

50. *See Hernandez*, 93 F.3d at 1499.

51. *See Griffin*, 7 F.3d at 1519.

52. *Berkemer v. McCarty*, 468 U.S. at 442, 104 S.Ct. 3138.

does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." [53] But, Hbaiu's pre-*Miranda* request for a lawyer took place after the drug dog alerted to the U-haul trailer. Thus, at the time Hbaiu invoked his right to counsel, he was aware that the canine sniff had indicated the presence of drugs in the trailer. At such a juncture, a reasonable person might consider themselves under arrest.

The government contends that the troopers did not hear Hbaiu's request; the videotape proves that the officer heard the request. The government further contends that Hbaiu's request was an "anticipatory invocation" of rights made before the drug dog alerted and before Hbaiu was placed under arrest. But, the videotape proves that this request came after the drug dog alerted. The audio portion of the videotape was off at the time the dog alerted to the trailer. But, the audio portion came back on shortly afterward, and Hbaiu is at that time heard to say "we want a lawyer." Even if Hbaiu was not considered under arrest until the trailer was opened and the ketamine was found, at the time the drug dog alerted, it is clear that Hbaiu was in custody. Not only was his purported driver's license still in Lytton's possession, but it is clear that upon the drug dog alert, none of the men was free to go until the officer's searched the trailer. Thus, commencing with the drug dog alert, Hbaiu was in custody. And, his subsequent attempt to invoke his right to

counsel was therefore not at all anticipatory.

However, even if Hbaiu was not in custody, the Court concludes that under these specific circumstances, his invocation of right to counsel was not anticipatory in the typical sense of that word. The case law on anticipatory invocation is not settled. Courts have inconsistently answered the question of whether the protections offered by *Edwards* apply when a suspect requests to speak to an attorney during a non-custodial encounter. [54]

The second prerequisite to application of *Miranda* is that the suspect must have been subjected to "interrogation." In *Rhode Island v. Innis,* [55] the Supreme Court held that not all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. [56] The procedural safeguards outlined in *Miranda* are required where a suspect in custody is subjected to interrogation, which "must reflect a measure of compulsion above and beyond that inherent in custody itself." [57] Interrogation under *Miranda* refers not only to express police questioning but also to police practices that the "police should know are reasonably likely to elicit an incriminating response from the suspect." [58]

A defendant may invoke the right to remain silent or the right to counsel either prior to or during interrogation. The Supreme Court has questioned, but not explicitly overruled this language in *Miranda* with *McNeil v. Wisconsin,* [59] stating

---

53. *United States v. Erving L.,* 147 F.3d 1240, 1247 (10th Cir.1998).

54. *See United States v. Bautista,* 145 F.3d 1140, 1151 (10th Cir.) *cert. denied* 525 U.S. 911, 119 S.Ct. 255, 142 L.Ed.2d 210 (1998); *Robinson v. Trast,* 128 F.Supp.2d 710, 716 (D.Kan.2001).

55. 446 U.S. 291, 297, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

56. *Id.* at 299, 100 S.Ct. 1682.

57. *Id.* at 300, 100 S.Ct. 1682.

58. *Id.* at 301, 100 S.Ct. 1682.

59. 501 U.S. 171, 182 n. 3, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)

"[w]e have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation'". "To allow an individual to interpose *Miranda* [requirements] in a situation outside the custodial interrogation context would represent an unwarranted extension of *Miranda's* procedural safeguards."[60]

In *United States v. Bautista*,[61] the Tenth Circuit held that *Miranda–Edwards* protections to not apply to non-custodial interrogations, and the right to counsel is not an anticipatory right. Absent either, *Miranda* and *Edwards* are not implicated. Hbaiu had not been arrested, but he could reasonably be found to be in custody when he requested a lawyer. Although the Tenth Circuit has held that one may not effectively invoke one's right to an attorney in advance of a custodial interrogation, at the time that Hbaiu invoked his right to counsel, he could have reasonably believed that he was in custody. After one hour, forty-five minutes and a positive drug dog alert, his earlier consensual type behavior did not prevent this investigative detention from becoming a custodial encounter.

With Hbaiu effectively invoking his right to a lawyer, the troopers were barred from further interrogation without counsel "unless the accused himself initiates further communication, exchanges, or conversations with the police."[62] A defendant who shows "a willingness and a desire for a generalized discussion about the investigation" is deemed to have initiated conversation, despite having earlier asserted his or her right to counsel.[63] Hbaiu was *Mirandized* an hour or more after his invocation of right to counsel. The troopers testified that Hbaiu then waived his right to counsel. But any waiver after Hbaiu's request for a lawyer is not valid, because the troopers were barred from further interrogation or obtaining a Miranda waiver, once Hbaiu effectively invoked his right to counsel. There is no evidence that Hbaiu initiated the conversation at the sheriff's office; rather the evidence suggests that the troopers Mirandized him and that they initiated interrogation.

## 5. Conclusion.

The Court therefore concludes that Hbaiu lacks standing to challenge the search of the trailer and that the evidence seized from the trailer is not suppressed. The Court further concludes that this incident did not commence with a "traffic stop" caused by an exertion of police power, but was a voluntary stop by the driver at the driver's alleged destination, Wilson Lake. However, if the trooper following this vehicle for ten miles could be interpreted as an exertion of police power, then the trooper had an articulable reasonable suspicion justifying a stop of this vehicle. The stop never became a consensual encounter with the defendant, but escalated into an investigative detention which lasted one hour, forty-five minutes or more. The troopers had an articulable reasonable suspicion for this lengthy investigative detention, and the length of the detention was due in part to matters outside of the troopers' control. The detention escalated into a custodial detention and arrest of Hbaiu and Hbaiu had reason to believe that he was in custody after the drug dog alerted to the trailer. Therefore, Hbaiu's invocation of right to counsel was not anticipato-

---

**60.** *Alston v. Redman,* 34 F.3d 1237, 1251 (3rd Cir.1994).

**61.** 145 F.3d at 1147.

**62.** *Id.*

**63.** *Oregon v. Bradshaw,* 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion).

ry, and renders all subsequent statements made by Hbaiu suppressed.

IT IS SO ORDERED.