# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 15, 2009 Session

## STATE OF TENNESSEE v. ROBERT LEE MILLER

**Direct Appeal from the Criminal Court for Carter County**
**No. S17033      Robert E. Cupp, Judge**

---

**No. E2008-01945-CCA-R3-CD - Filed November 17, 2010**

---

The appellant, Robert Lee Miller, was found guilty of the first degree murder of the victim, Krystal Dubuque, during the perpetration of an aggravated rape, and he was sentenced to life imprisonment in the Tennessee Department of Correction.  On appeal, the appellant argues

1.  that the trial court erred in admitting a videotaped interview of the appellant dressed in his prison uniform;

2.  that the trial court should have excluded the testimony of Rodney Perkins identifying the appellant as the person he saw near the victim's car;

3.  that the trial court erred in not granting a mistrial when the State disclosed that recent blood testing had revealed that blood in the victim's underwear was not that of the appellant;

4.  that the trial court erred in not granting the appellant's motion for a judgment of acquittal pursuant to Rule 29 of the Tennessee Rules of Criminal Procedure;

5.  that the trial court erred in permitting the introduction of prior act evidence regarding the appellant's dealings with other women and specifically regarding statements about his desire to be sexually involved with the victim;

6.  that the trial court erred in not suppressing all statements made by the appellant as they were obtained in violation of his right to counsel as secured by the Tennessee State Constitution

Article I, Section 9 and Amendments Five and Six of the U.S. Constitution; and

7. that the appellant's right to a speedy trial was violated.

Upon review, we affirm the judgment of the trial court. However, we must remand to the trial court for entry of a corrected judgment of conviction to reflect the appellant's guilt of count one, felony murder, instead of count two, premeditated first degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Clifton L. Corker, Johnson City, Tennessee, for the appellant, Robert Lee Miller.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Anthony Wade Clark, District Attorney General; and Kenneth C. Baldwin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, the evidence adduced revealed that in January 2004, the twenty-two-year-old victim began working for the appellant, who was a bounty hunter and also did some surveillance work. The victim was not the first young woman to work with the appellant. In fact, the appellant would find young women he thought "look[ed] hot" and offer them money and health insurance to work for him. The appellant laughed about his intention to not pay them and said "he'd end up getting some off of them." Specifically, while the victim worked for the appellant, he told at least two people of his desire to have sex with the victim. However, none of the victim's friends believed there was a sexual relationship between the appellant and the victim.

Around the time the victim began working with the appellant, she and her young son were living with Dwayne and Jessica Williamson.[1] At approximately 6:45 p.m. on February

---

[1] When the victim was living there, Dwayne and Jessica Williamson were dating; however, they
(continued...)

15, 2004, the Williamsons returned to their apartment after being out most of the day. The victim had cooked supper, which included chicken, potatoes, and peas and was planning to work with the appellant that evening. The Williamsons tried to convince the victim not to work that evening because the weather was bad and the roads were slick with snow. However, the victim, who had a partially completed check the appellant had given her, wanted to work that evening so the appellant would pay her for the three weeks she had worked.

At approximately 8:30 or 8:45 p.m., the appellant came to the Williamsons' apartment to pick up the victim. Dwayne Williamson, who was babysitting the victim's son, saw the victim leave the apartment parking lot in her red 1988 Chevrolet Nova. The appellant was following her in a black, late-model Suburban. The Williamsons never saw the victim again.

Sometime between 8:00 and 10:00 p.m. on February 15, 2004, the victim stopped at a Sunoco gas station and purchased two or three gallons of gas. The victim's red Nova was left in the gas station parking lot but was gone by 11:00 p.m.

Around 11:45 p.m., the appellant called Dwayne Williamson, asking if the victim had returned home. The appellant said that he had dropped off the victim two hours earlier at a Sunoco gas station parking lot. Dwayne Williamson told the appellant he would go out looking for the victim; however, he was unable to find her. The appellant called several times during the night to check on the victim. The appellant said that he had been out looking for the victim until about 3:00 a.m.

Julie Robertson, an employee of Greystoke Chevrolet, testified that around the time of the victim's disappearance, the appellant had taken a black Chevrolet Suburban valued at $25,000 for a four-day test drive. The appellant had promised to pay for the vehicle with a check. When the appellant returned the vehicle at around 10:00 a.m on February 16, 2004, he told Robertson that the inside of the vehicle should be cleaned before he purchased it. Later that day, the appellant called to ask what type of "cleaning agent" had been used on the Suburban's interior. The appellant never purchased the vehicle or asked about it again.

On February 18, 2004, two men were fishing in the Watauga River. One of the men noted that the water had risen when "they" had been "generating" the night before, but it was down that morning. The men looked over to the side of the river, saw the victim's body partially in the river, and called 911 to report it.

_____

[1](...continued)
were married at the time of trial.

The county coroner, Johnny Miller, and Dr. Greta Stephens,[2] the medical examiner, arrived on the scene around 2:00 p.m. When Dr. Stephens arrived, the victim was already in rigor mortis with her knees slightly bent and one arm flexed above her head. Dr. Stephens concluded that the victim went into rigor mortis somewhere other than where she was found. Dr. Stephens observed that the victim's hair was across a branch, indicating that the victim's body had once been immersed in water and her hair stayed over the branch when the water receded.

Dr. Stephens oversaw the victim's body being placed in a body bag. Dr. Stephens told people at the scene that when the victim's mother identified the body, only the victim's face should be exposed; the body was not to be further disturbed and was to be transported directly to Dr. Stephens' office. Miller did not hear Dr. Stephens' directive, and he removed the victim's socks and shoes, raised her pants' legs, raised her shirt, and unfastened her belt and her pants to look for any visible wounds. The body was then taken to Sycamore Shoals Hospital where it was x-rayed before being transported to Dr. Stephens' office.

Dr. Stephens performed an autopsy on the victim's body on February 19, 2004. Later, Dr. William McCormick, a forensic pathologist, also examined the autopsy results, including photographs of and slides taken from the body.[3] The autopsy revealed that the victim was a small woman, five feet, one and a half inches tall and approximately ninety pounds. The doctors noted that the victim had several abrasive injuries to her face, some of which were probably caused postmortem by floating face-down across the river bed. However, an abrasion to the underside of the victim's nose appeared to be a "rug burn" which was likely not caused by being in the river. Additionally, there was a scrape on the victim's elbow which, in the doctors' opinions, was not caused by being in the river. They explained that the victim was found wearing a long-sleeved sweatshirt which covered her elbows.

Sperm heads were found in the victim's anus. Dr. Stephens noted that the anus is a bacteria-laden region and that it is rare for sperm to exist for long in that area. Sperm with intact tails were found in the victim's vagina. Dr. Stephens opined that the cold environment, namely the river in February, helped to preserve the sperm.

The autopsy revealed "mechanical force tears" to the victim's anus. Also, the anus was dilated more than what normally occurs with relaxation of the sphincter muscle after death. Additionally, there were tears to the victim's vagina and fresh "[b]lunt mechanical trauma" inside the victim's body cavity, specifically to the adnexa, an area encompassing the

---

[2] At trial, Dr. Stephens was qualified as an expert in forensic pathology.

[3] At trial, the parties stipulated that Dr. McCormick was an expert in forensic pathology.

ovaries and fallopian tubes. Dr. McCormick explained that "[t]he anus will tear with a great deal less force than the vagina. The vagina was constructed to dilate . . . a great deal." Dr. McCormick believed the injuries to the anus and vagina were "caused by relatively severe, forceful, blunt trauma," which occurred from an "instrument," such as a penis, being inserted into the victim's vagina and anus "with very considerable force," exceeding what would be expected during "normal sex." Dr. McCormick acknowledged that an object other than a penis, such as a broom handle, could have caused the injuries; however, he stated, "We do know from the autopsy report . . . what it probably was . . . because sperm were found, and I've never seen sperm come from a broom handle."

The doctors noted that slides of the injuries, one each from the anus, vagina, and adnexa, showed no evidence of inflammatory response. The doctors opined that this lack of inflammatory response, indicated that the injuries occurred approximately thirty minutes to an hour before the time of death. While the victim lived, the tears would have bled an amount comparable to a typical menstrual flow.

The victim's gastric contents consisted of 170 milliliters of food, including peas; a pale, stringy meat; white potatoes; and cheese. Dr. Stephens said that the average person's stomach will empty completely within two to four hours of finishing a meal; therefore, the findings indicated that the victim died before her stomach emptied. Given that the victim was a healthy young woman who had not ingested alcohol or drugs, Dr. McCormick opined that if the victim had finished her meal at 7:00 p.m., she died around 8:30 to 11:00 p.m.

Dr. Stephens found mild bleeding in the area of the neck and a small bruise to the neck muscles located behind the larynx. She also found petechia in the victim's eyes and scalp, which suggested suffocation. Dr. Stephens interpreted these findings to be consistent with "impact compression" or movement while the area was being compressed. Specifically, she said the findings were consistent with the victim "being sodomized and vaginally assaulted from behind in a vehicle with carpet, and her head is being held and pushed down into that carpet while that act of sodomy and rape is going on." Dr. Stephens believed the hypothetical scenario could also account for the "rug burn" on the victim's nose.

Hair samples collected from the victim were consistent with hair from the victim and with hair from the appellant. Additionally, the sperm collected from the victim was the appellant's. However, no forensic evidence could be retrieved from the Suburban because it had been cleaned. Also, no usable forensic evidence was retrieved from the victim's car.

Linda Marcum, a private investigator hired by the victim's family, discovered pieces of a torn check along the river near the Bee Cliff Cabins. Marcum informed police about the check, and the police retrieved the check. The check was from an account the appellant had

closed more than two years earlier and was made payable to the victim. The check had never been cashed. The appellant explained that he gave the victim a "flash check" to show prospective landlords and that she knew the check was worthless. The appellant said that on the night of February 15, 2004, the victim gave him back the check. He told her to tear it up; she complied and threw it out the window while they were driving near Bee Cliff Cabins.

During the investigation, the appellant gave numerous, conflicting statements about the victim. Notably, the appellant and his wife placed numerous calls to Investigator Hamm, Chief Parrish, Officer Michael Peters, Investigator Joe Woodard, and a local television news station. The appellant initially stated that he and the victim did not have a sexual relationship and that on the night in question he dropped her off at the Sunoco when the weather got too bad and that he watched the victim drive away. Eventually, the appellant said that he and the victim were having an affair, and he estimated they had intercourse ten times.

The appellant also claimed that he, the victim, and Erin Snead were together at the Bee Cliff Cabins on the night of February 15, 2004, and that Snead got mad at the victim. The appellant said that while they were at the cabins, the victim spoke with a man from North Carolina who was renting one of the cabins and that she used the man's restroom. Arthur Franklin Reed, Jr., the man from North Carolina who was staying with his wife in Bee Cliff Cabins on February 15, 2004, denied ever seeing a young lady that night. He specifically denied anyone coming into his cabin that evening to use his restroom.

The appellant said that after "huffing" an aerosol can, Snead and the victim went off without him and that Snead later told him that they had accidentally driven the victim's car into the river. The appellant opined that Snead had something to do with the victim's death. However, both Snead and her mother asserted that Snead was home all day and night on February 15, 2004.

Later, the appellant maintained that when he returned home on the night of February 15, his wife accused him of sleeping with the victim. His wife left and returned later that evening. The appellant said his wife did not act surprised when the victim's car was found in the river, and he believed his wife was involved in the victim's death.

The appellant's ex-wife, Teresa Ann Miller,[4] and his son, James Miller, testified that the appellant came home around 10:00 or 10:30 p.m. on the night of February 15, 2004. They said that the appellant never left home again that night. Teresa Miller acknowledged that the appellant was very upset by the victim's disappearance and death and that he would cry often about it. Mrs. Miller also stated that the appellant was "obsessed with anal sex," but he knew

---

[4] They were married at the time of the offense, but they were divorced at the time of trial.

that with her "he can't go there." She conceded that her refusal to engage in anal sex with the appellant was a "big problem" between them.

The appellant employed Dr. Donald Jason, a forensic pathologist and professor at Wake Forest University. Dr. Jason questioned the findings of Dr. Stephens and Dr. McCormick. Specifically, Dr. Jason stated that the tearing of the victim's anus and vagina could have been a "postmortem artifact" exacerbated by tugging of the area during an examination of the body. He also noted that the tears could appear worse than they actually were because the skin was "waterlogged" from extended submersion in water. He opined that intent could not be determined by the extent of the injuries. Dr. Jason noted that gastric emptying typically occurs within four to six hours, and, therefore, he could not say with reasonable certainty that the victim died within two hours of eating.

A defense witness, Rodney Perkins, testified that on the morning of February 16, 2004, he got to work at Snap-On Tools around 4:45 a.m. He looked around for trucks bringing a scheduled steel delivery; however, he saw no vehicles around. At approximately 5:30 or 5:45 a.m., Perkins heard gravel crunching and believed his delivery had arrived. He looked out and saw someone wearing a heavy coat and a toboggan or hood walking across the bridge. Around 7:45 a.m. on February 16, 2004, the victim's red Nova was discovered in the Watauga River. The engine was running, and the driver's seat was pushed back as far as it would go. There were no marks indicating that the brakes had been applied prior to the car coming to rest in the river. Perkins testified that during the trial he had the opportunity to watch the appellant walk. He stated that due to the appellant's distinctive walk, he could identify the appellant as the man crossing the bridge that morning.

Based upon the foregoing, the jury found the appellant guilty of first degree murder of the victim during the perpetration of an aggravated rape. The trial court sentenced the appellant to life with the possibility of parole. On appeal, the appellant raises numerous issues, which we will address in turn.

## II. Analysis

### A. Admission of Videotape

The appellant contends that the trial court erred by "admitting a videotaped interview of the [appellant] conducted by law enforcement which depicted him in his prison uniform." Generally, a trial court's decision to admit or exclude evidence at trial will not be overturned absent an abuse of discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002). An abuse of discretion exists when the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party

complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

The appellant does not contend that the videotaped interview was not relevant. See Tenn. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); see also Tenn. R. Evid. 402 (providing that "[a]ll relevant evidence is admissible except as [otherwise] provided"). Instead, the appellant argues that it was prejudicial for the jury to observe him "dressed in prison garb" during the videotaped interview. Essentially, the appellant's argument is a challenge under Tennessee Rule of Evidence 403, which provides that even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See also State v. Taylor, 240 S.W.3d 789, 795 (Tenn. 2007).

In support of his argument, the appellant cites Estelle v. Williams, 425 U.S. 501, 504-05 (1976), in which the United States Supreme Court stated that forcing a defendant to stand trial while wearing prison clothes is a due process violation because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." This court has also stated that "trial courts should take every precaution to avoid the display of the accused, who stands presumptively innocent, in prison garb or any type of restraint which reflects their custodial status." State v. Doreen Jones, No. M2003-01942-CCA-R3-CD, 2005 WL 639141, at *10 (Tenn. Crim. App. at Knoxville, Mar. 18, 2005).

However, the appellant was not "tried" while wearing prison attire; he was simply shown in prison attire during a twenty-minute videotaped interview of his statement to police, a brief span of time during the appellant's six-day trial. Moreover, the jury had already been repeatedly informed by defense counsel that the appellant had been held in jail because he could not make bond. The trial court gave a limiting instruction after the videotape was played, instructing the jury to place no significance on the appellant's appearance "in inmate clothing." We conclude that the video's probative value was not substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. Therefore, like the court in Taylor, we conclude "that the brief videotape of the [appellant] wearing jail attire in this case did not serve as a 'constant reminder' to the jury that the [appellant] had been previously jailed and it did not corrupt the presumption of innocence on which the jury was properly instructed." Taylor, 240 S.W.3d at 797.

B. Perkins' Testimony

The appellant contends that the trial court erred in allowing Rodney Perkins, a defense witness, to testify that the person he observed walking on a bridge near the area where the victim's car was discovered walked like the appellant. The appellant argues that this testimony constituted a violation of Tennessee Rule of Evidence 602, which provides:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony. . . .

We note that this rule of evidence is "[a]lso called the 'first-hand knowledge rule,' [and essentially] provides that a witness is not competent to testify unless he perceived the facts through one or more of the five senses." State v. Boling, 840 S.W.2d 944, 949 (Tenn. Crim. App. 1992).

This court has previously explained:

> In determining whether a witness is competent for purposes of Rule 602, the trial court must determine whether a witness had a sufficient opportunity to perceive the subject matter about which he or she is testifying. Thus, the party offering the testimony must introduce sufficient evidence to support a jury finding that the witness had personal knowledge of the matter.
>
> While the rule fails to define what constitutes "knowledge," the rule does not require "absolute certainty." Nevertheless, the witness/declarant's statement may not be based on mere speculation.

State v. Land, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000) (quoting Neil P. Cohen et al., Tennessee Law of Evidence, § 602.4, p. 313-14 (3rd ed. 1995)).

Perkins was called as a witness for the defense to dispute the State's time-line of events. On cross-examination, the prosecuter mentioned a conversation he had with Perkins in the hallway during trial. Perkins acknowledged for the first time, that he believed the appellant was the person he saw walking from the area where the victim's car was found. Upon further questioning, Perkins said he believed the person was the appellant because of "the way he was carrying himself and the way he walked." Defense counsel objected to

Perkins' testimony. The trial court overruled the objection, noting that the prosecution was asking justifiable questions on cross-examination and that Perkins was allowed to form an opinion about the identity of the person he saw crossing the bridge that morning.

As cross-examination continued, Perkins stated that the man on the bridge that morning had a "walk that was different from a normal person's walk." He explained that he had an opportunity to observe the appellant during the trial, and during the previous trial which had resulted in mistrial, and that he noticed the appellant had the same, distinctive walk.

Perkins' testimony was undeniably relevant to establish the identity of the person who arguably placed the victim's car in the river. Perkins positively identified that person as the appellant, based on the distinctive way the appellant walked. Perkins said he had ample opportunity during the trial, and during a previous trial which resulted in mistrial, to observe the appellant's walk, and he determined that the person on the bridge walked the same way. Generally, "[q]uestions concerning a witness's identification of a defendant go to the weight and credibility of his testimony and not to the admissibility of the testimony." State v. Robinson, 971 S.W.2d 30, 45 (Tenn. Crim. App. 1997). Therefore, we conclude that the jury was entitled to consider this testimony and attribute whatever weight it deemed appropriate.

## C. Mistrial

The appellant maintains that the trial court "erred in not granting a mistrial when the State revealed that the blood in the victim's underwear was not that of the [appellant] when they had previously been advised that it was." On the day the appellant's first trial resulted in a mistrial, the State advised defense counsel that the State was going to pursue additional forensic testing on the physical evidence. On May 3, 2007, the prosecutors and defense counsel learned that recent testing by the Tennessee Bureau of Investigation (TBI) crime laboratory had identified the appellant's blood on the victim's panties. On May 6, 2007, the second day of trial, the appellant moved for a continuance to investigate this evidence, but the trial court denied the motion, finding that the evidence supported both the State's theory of forcible penetration and the appellant's defense that he and the victim engaged in "rough sex."

Subsequently, on May 10, 2007, TBI Special Agent Chad Johnson testified about testing done on various items collected from the victim and the appellant. However, he did not testify about blood on the victim's panties. At the conclusion of Agent Johnson's direct examination, the State requested a bench conference. At that time, the State informed the court and defense counsel that although Agent Johnson believed the stain on the victim's panties to be the appellant's blood, he could not say so definitively. The State explained that

-10-

Agent Johnson thought he might be "picking up DNA from sperm that might have been entangled in that area, so I'm not going to ask him about that." Defense counsel did not raise any objection. The State's case continued, with over a dozen witnesses called prior to the issue being raised again.

The next day, May 11, 2007, defense counsel advised the court that "after further reflection" he needed to move for a mistrial based upon the misinformation he received about the appellant's blood being on the victim's panties. Defense counsel stated that he believed that the State acted "innocently enough," but he contended that if the blood were the victim's, it would support the defense theory that she was alive and walking around after the sexual encounter with the appellant. The prosecutor said that he had been informed that the stain was not the victim's blood. The trial court found that there was no evidence in front of the jury about blood on the victim's panties. Moreover, the court stated that the evidence was not exculpatory and was not inconsistent with the appellant's theory that he and the victim engaged in rough sex. Therefore, the court overruled the motion for mistrial.

On appeal, the appellant contends that the belief that the appellant's blood was on the victim's panties "affected how the case was handled." Accordingly, he argues that there was a manifest necessity for a mistrial. The State argues that the appellant waived this issue by failing to make a contemporaneous motion for mistrial. Regardless of any timeliness issues, the appellant is not entitled to relief on this issue.

A mistrial should be declared in criminal cases only in the event that a manifest necessity requires such action. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). In other words, a mistrial is an appropriate remedy when a trial cannot continue or a miscarriage of justice would result if it did. State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial lies within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion absent clear abuse appearing on the face of the record. See State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (citing State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990)). Moreover, the burden of establishing the necessity for mistrial lies with the party seeking it. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Although the appellant argues that the misinformation about the stain "affected how the case was handled," he has failed to demonstrate in what way. As the trial court noted, if the stain was the appellant's blood, that evidence supported theories espoused by both the State and the appellant. Further, discovering that the stain could not conclusively be said to be the appellant's blood did not affect the case, especially as the jury was never informed about the stain. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for mistrial.

## D. Sufficiency of the Evidence

The appellant contends that the trial court "erred in not granting the [appellant's] motion for a judgment of acquittal pursuant to Rule 29 of the [Tennessee Rules of Criminal Procedure]." The appellant argues that the State failed to prove that the appellant committed the aggravated rape of the victim, contending that, at most, the State established that the appellant and the victim had consensual "rough sex." Additionally, the appellant maintains, "There was no evidence that [the victim] died while being raped."

The record reveals that at the conclusion of the State's proof, the appellant made a motion for judgment of acquittal. The trial court denied the motion. However, the appellant renewed the motion at the close of all proof. A motion for judgment of acquittal is a question of law; therefore, the trial court can only review the legal sufficiency, not the weight, of the evidence. State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). Accordingly, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Thus, we will address the appellant's complaint as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Felony murder is defined as "[a] killing of another committed in the perpetration of . . . any . . . rape." Tenn. Code Ann. § 39-13-202(a)(2) (2003). Aggravated rape is defined in pertinent part as the unlawful sexual penetration of a victim by the defendant or the defendant by the victim when the defendant causes bodily injury to the victim. Tenn. Code Ann. § 39-13-502(a)(2) (2003). Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's

body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7) (2003). This court has previously concluded that the term "unlawful" generally refers to non-consensual acts. See State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994).

This court has previously stated that

> for purposes of felony murder, the "killing may precede, coincide with, or follow the felony" but that the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Whether the intent to commit the underlying felony existed prior to or concurrent with the killing is a question of fact for the jury to decide. The requisite intent cannot be presumed from the act of committing the felony, but "a jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing."

State v. Richard Cleveland Martin, No. M2007-02097-CCA-R3-CD, 2009 WL 1372287, at *16 (Tenn. Crim. App. at Nashville, May 18, 2009) (quoting State v. Buggs, 995 S.W.2d 102, 106-08 (Tenn. 1999)), perm. to appeal denied, (Tenn. 2009).

The proof at trial revealed that the victim ate around 7:00 p.m. on February 15, 2004, and that she and the appellant left her apartment to go to work around 8:30 p.m. The State's expert witnesses estimated that the victim died two to four hours after eating. However, the experts opined that the contents of the victim's stomach suggested the victim's death occurred at the lower end of the range, two hours or less after eating. The appellant's sperm was found in the victim's anus and vagina. Additionally, there were multiple tears to the victim's anus and vagina which Dr. McCormick stated could not be attributable to "normal sex" as the penetration was with "very considerable force." Dr. Stephens opined that the victim's injuries, including the "rug burns" to her face, were consistent with the victim's neck being held down into carpet while she was being sexually penetrated from behind. Because the injuries to the victim's anus and vagina were "fresh" and had no signs of inflammation, the State's experts opined that the wounds occurred as soon as thirty minutes prior to the victim's death. The victim died as a result of strangulation, which Dr. Stephens explained could have been caused by compression of the victim's neck. Additionally, the appellant was seen leaving the victim's car in the river the morning after the victim's disappearance. There was no evidence, outside of one of the appellant's many conflicting

-13-

versions of events, that the appellant and the victim had a sexual relationship. See State v. Rice, 184 S.W.3d 646, 663-64 (Tenn. 2006). Moreover, the appellant had previously expressed a desire to engage in an aggressive and rough sexual relationship with the victim. We conclude that there was sufficient evidence for a jury to conclude the appellant killed the victim during an aggravated rape.

### E. Prior Act Evidence

The appellant argues that the trial court "erred in permitting the introduction of bad act evidence regarding the [appellant's] dealing with other women and specifically regarding statements about his desire to be sexually involved with the victim." At trial, Amber Barker testified that the appellant "said [the victim] had a nice ass. . . . He would knock the bottom out of it, out of her pussy." The State then asked, "[D]id he talk about girls in general and having sex with them and stuff like that?" Barker replied, "Yes, sir." The appellant then objected on the basis of relevance. The trial court overruled the objection. Barker further testified that the appellant

> Talked about I believe it was a lady's name, Erin, that he had ate her pussy on the hood of his car and that her ass cheeks was on the window and that he always preferred to eat girls' pussy rather than actual have sex with them because his wife wouldn't know that way, was the conversation.

The appellant did not object to the testimony about "Erin."

Later, the State called Ashley Norris as a witness. The appellant objected to Norris' testimony, arguing, "This is the same kind of thing." The trial court overruled the objection. Norris testified that the appellant said the victim "had a nice ass and he'd beat it up if he ever got a chance. And, you know, just talking about how he'd like to have sex with her and stuff like that, perverted kind of like." Norris stated that the conversation happened a week and a half or two weeks prior to the victim's disappearance. Norris testified that in November 2006, she got a letter from the appellant. She did not read the letter and later gave it to police.

As we have noted, the appellant objected to the testimony of Barker and Norris regarding the appellant's sexual comments about the victim and other females on the basis that the statements were irrelevant under Tennessee Rule of Evidence 401. However, his argument centered around "propensity," which is essentially a complaint under Tennessee Rule of Evidence 404(b). On appeal, he contends that the statements were inadmissible under Tennessee Rule of Evidence 404(b), arguing that the statements were essentially

"[e]vidence of other crimes, wrongs, or acts [which were] not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Initially, we note that the appellant waived the issue regarding Barker's testimony about the appellant's having sex with "Erin" by failing to contemporaneously object to that testimony. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. Evid. 103(a)(1).

Regarding the other contested statements, we note that Tennessee Rule of Evidence 404 provides:

> (b) Other Crimes, Wrongs, or Acts. - Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005), State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character.

Baker and Norris' testimonies about the appellant's desire to have sex with the victim were relevant to show the appellant's intent to engage in sexual relations with the victim similar to those which occurred just prior to her death. Accordingly, these statements were admissible under 404(b).

F. Suppression of Statements

As we stated earlier, beginning right after the victim's disappearance and continuing well into the appellant's incarceration, the appellant and his wife made many statements to detectives, officers, investigators, acquaintances, and reporters. The appellant argues that the trial court erred in failing to suppress statements he made to police, arguing that the police solicited the statements in violation of his Fifth and Sixth Amendment rights to counsel. In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

First, we will address the appellant's contention that his Fifth Amendment rights were violated, requiring that his statements be suppressed. The facts pertinent to this issue are as follows. At the suppression hearing, Investigator Hamm testified that the appellant and his wife, Teresa Miller, called Investigator Hamm many times about the case, wanting to be involved in the investigation. The record reflects that the calls started on February 16, 2004, with two calls from Mrs. Miller to Investigator Hamm. Starting at 8:19 a.m. on February 17, 2004, Mrs. Miller and the appellant called Investigator Hamm and Chief Parrish multiple

times. For instance, at 8:52 and 9:24 p.m., the appellant called and left voicemail messages for Chief Parrish, asking him to return the appellant's call. Additionally, Mrs. Miller left Chief Parrish a voicemail message at 9:11 p.m., asking for a return call. At 9:34 p.m., the appellant left a voicemail message for Investigator Hamm, requesting a call back. Investigator Hamm returned the appellant's call at 9:40 p.m.

Shortly thereafter, Mrs. Miller called Investigator Hamm. During that call, Mrs. Miller said that "Crockett [an attorney] said he preferred him to be present when you talk to him [the appellant]." She then stated that they would "wait until tomorrow" to speak with police. Investigator Hamm told Mrs. Miller that he would talk with Chief Parrish and that she or the appellant could call Investigator Hamm the next day or he would call them. Mrs. Miller agreed with that plan. Later that same day, Chief Parrish called the appellant, and they discussed the victim's disappearance. Chief Parrish asked if the appellant was involved in the victim's disappearance or if he knew anyone that would be involved in the disappearance. The appellant denied any knowledge about the disappearance. The appellant was very involved in the conversation and began crying.

The appellant alleges that Chief Parrish's call to him on February 17, 2004, violated his right to counsel which was invoked by his wife stating that "Crockett [an attorney] said he preferred him to be present when you talk to him [the appellant]." Therefore, the appellant contends that the dozens of statements later given by him should be suppressed.

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). As our supreme court has explained:

> In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). Miranda warnings are necessary only in situations involving custodial interrogation or its functional equivalent. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); State v. Dailey, 273 S.W.3d 94, 102-03 (Tenn. 2009). In determining whether a suspect is in custody for Miranda purposes, we must consider "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996). The analysis is very fact-specific. Id. Certain factors are relevant to our inquiry, including but not limited to the following:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id. Whether a suspect is in custody is determined by an objective test. State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997).

The appellant does not argue that his statements prior to May 4, 2004, when the appellant was first incarcerated, were the result of custodial interrogation. Notably, the statements given by the appellant prior to that date were from telephone calls to, or usually from, the appellant at his home. Therefore, the appellant's statements were not the product of custodial interrogation. Even if the appellant's right to counsel was invoked by him and his wife saying that his attorney preferred to be present before further questioning, other courts have held that "Miranda rights . . . apply only to custodial interrogations [or its functional equivalent]. If a suspect is not in custody, 'then his attempts to invoke his right to remain silent and his Miranda right to counsel are ineffective.'" United States v. Murray, 696 F. Supp. 2d 1044, 1056 (D. Ariz. 2010) (quoting United States v. Bautista, 145 F.3d 1140, 1149 (10th Cir. 1998)); see also Innis, 446 U.S. at 300-01; United States v. Hines, 963 F.2d 255, 256 (9th Cir. 1992) (holding that a defendant's reference to his lawyer during an interview was not an invocation of his Miranda rights because he was not in custody).

"[B]ecause [the appellant's] interrogation was not custodial, the police were not required to cease questioning him when he purported to invoke his right to remain silent or to counsel." United States v. Mason, 660 F. Supp. 2d 479, 490 (W.D.N.Y. 2009).

Moreover, as was found by the trial court, the appellant's statements on February 17, 2004, before the appellant was placed in custody, were initiated by the appellant or by the police returning calls from the appellant or his wife. Even if the right to counsel is properly invoked, it can be waived if the conversation is instigated by the appellant. Accordingly, the record reflects that the appellant's Fifth Amendment right to counsel was not violated.

Next, we turn to the question of whether the appellant's June 6, 2004 statement was taken in violation of his Sixth Amendment right to counsel. The facts pertinent to this issue are as follows. The appellant, who was incarcerated at the time, told jailer Virginia Arney that he needed to speak with "someone." Arney told Chief Kathy Terrill of the appellant's request. Chief Terrill contacted the Carter County Sheriff's Department who deployed Investigator Hamm and TBI Agent Shannon Morton to speak with the appellant. When Investigator Hamm and Agent Morton arrived, they verified with the appellant that he wished to speak with them. The appellant affirmed his desire to talk with them.

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution grant the criminally accused the right to counsel. See State v. Blye, 130 S.W.3d 776, 779 (Tenn. 2004). However, this right only attaches after the initiation of adversary criminal proceedings. Id. at 780. For example, the right to counsel attaches "at the time an arrest warrant issues, a preliminary hearing is held (if no arrest warrant is issued), or an indictment or presentment is returned." State v. Jackson, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993). Adversarial proceedings began against the appellant on May 4, 2004, when a presentment was returned against the appellant. Therefore, the appellant's Sixth Amendment right to counsel attached thereafter. However, even the Sixth Amendment right to counsel can be waived by an appellant's instigating conversation with police. See State v. Baker, 931 S.W.2d 232, 236 (Tenn. Crim. App. 1996). The appellant argues that the record reflects only that he asked to speak with "someone," not necessarily the police. However, the trial court found that the appellant requested to speak with police about his case. In the statement, police asked the appellant if he had requested to speak with them, and the appellant responded affirmatively. Finally, the appellant complains about the admission of another statement he made in August 2006 in a letter he wrote an officer. However, that letter was written voluntarily by the appellant. Accordingly, we conclude that the appellant's Sixth Amendment right to counsel was not violated and that the trial court did not err in refusing to suppress the appellant's statements.

G. Speedy Trial

Finally, the appellant argues that his right to a speedy trial "was violated given the delay in coming to trial." Initially, we note that this issue was raised in a "Second Amended Motion for New Trial" that the appellant filed pro se. It is well-established that a defendant may not be represented by counsel while simultaneously proceeding pro se. See State v. Davis, 141 S.W.3d 600, 615-16 n. 12 (Tenn. 2004) (citing Wallace v. State, 121 S.W.3d 652, 655 n. 2 (Tenn. 2003)); State v. Burkhart, 541 S.W.2d 365, 371 (Tenn. 1976). Therefore, this issue was not properly before the trial court and is arguably waived. See State v. Berry, 141 S.W.3d 549, 569 (Tenn. 2004). Further, we note that the transcript of the motion for new trial, during which this issue was presumably argued, was not included in the record for our review. The appellant carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Accordingly, the appellant is not entitled to relief on this issue.

### III. Conclusion

Finding no reversible error, we affirm the judgment of the trial court. However, during our review of the case, we observed that the judgment of conviction against the appellant states that he was found guilty of first degree murder on count two of the presentment. However, count two charged the appellant with premeditated first degree murder. Prior to trial, the State elected to proceed on only the felony murder count, which is count one of the presentment. Further, the trial transcript clearly reflects that the jury found the appellant guilty of count one. Accordingly, we remand to the trial court for entry of a corrected judgment of conviction to reflect the appellant's guilt of count one, felony murder.

_____
NORMA McGEE OGLE, JUDGE